643 F.2d 774
 207 U.S.App.D.C. 24
 Morton L. SIMONS and Barbara M. Simons, Appellants,
v.
Edgar T. BELLINGER, as Chairman of the Committee on
Unauthorized Practice of Law of the District of
Columbia Court of Appeals, Individually
and in his Official Capacity, et al.
 No. 77-2012.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 23, 1979.
Decided Jan. 4, 1980.
Rehearing Denied Nov. 6, 1980.
 
 Appeal from the United States District Court for the District of Columbia (D.C. Civil 75-1164).
 Morton L. Simons, Washington, D. C., with whom Barbara M. Simons, Washington, D. C., was on brief, for appellants.
 David P. Sutton, Asst. Corp. Counsel and John R. Risher, Jr., Corp. Counsel and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on brief for appellees.
 Before MacKINNON and WILKEY, Circuit Judges and RICHEY*, United States District Judge for the District of Columbia.
 Opinion for the Court filed by District Judge CHARLES R. RICHEY.
 Concurring opinion filed by Circuit Judge MacKINNON.
 Dissenting opinion filed by Circuit Judge WILKEY.
 CHARLES R. RICHEY, District Judge:
 Morton and Barbara Simons, attorneys practicing in the District of Columbia, appeal from a district court order awarding summary judgment to the defendants, who are members of the District of Columbia Court of Appeals Committee on Unauthorized Practice of Law ("The Committee"). The Simonses allege that the members of the Committee maliciously harassed them during an illegal investigation into their law practice. Their appeal calls for the Court to determine the scope of immunity, if any, which must be afforded the members of the Committee under the circumstances of this case. We affirm the district court because we find that absolute immunity is an appropriate shield for the Committee activities which the Simonses have put in issue.
 I. BACKGROUND
 A. The Committee on Unauthorized Practice of Law
 The District of Columbia Court of Appeals is empowered to establish rules "respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and expulsion."[1] This power is, of course, necessary to promote the best possible representation for individuals who must call upon a member of the bar for assistance. Pursuant to this power, the Court of Appeals has established three committees, all designed to promote the quality of legal representation. One of these, the Board on Professional Responsibility, is devoted to overseeing the conduct of those already admitted to the bar; the other two, the Committee on Admissions and the Committee on Unauthorized Practice of Law, are concerned with persons not yet qualified to engage in legal practice.[2] Together these three committees form a comprehensive system for the regulation of the practice of law in the District of Columbia: one committee determines who may be admitted to the bar, another disciplines attorneys, and a third committee disciplines non-members who intrude upon the court's jurisdiction by holding themselves out as authorized to practice law. The Simonses' suit is against this third entity, the Committee on Unauthorized Practice of Law.
 The Committee is composed of six individuals, all appointed by the District of Columbia Court of Appeals and all members of that court's bar. The Court of Appeals has authorized the Committee to carry out the provisions of Rule 46 II of the District of Columbia Court of Appeals Rules. The most significant subsection of that rule provides:
 No person shall regularly engage in the practice of law in the District of Columbia or in any manner hold himself out as authorized or qualified to practice law in the District of Columbia unless he is an enrolled active member of the Bar.
 D.C.Ct.App.R. 46 II (b)(I). The rule provides specific details regarding the import of the phrase "practice of law," see id. R. 46 II (b)(2) & (3), and it also excludes from its scope attorneys who are "participating . . . before any court of the United States" or "before any department, commission or agency of the United States." Id. R. 46 II (b)(6) & (7).
 The Committee is empowered to investigate and prosecute violations of Rule 46 II. In this respect, the Committee functions as both prosecutor and grand jury: it not only determines who shall be prosecuted, but also takes charge of the prosecution. E. g., In re Amalgamated Development Co., 375 A.2d 494 (D.C.App.), cert. denied, 434 U.S. 924, 98 S.Ct. 403, 54 L.Ed.2d 282 (1977). Rule 46 II (b)(8) provides that violations "shall be punishable as contempt and/or subject to injunctive relief." This limitation of remedies, of course, greatly distinguishes the Committee from a criminal prosecutor. In contrast to this familiar figure in the criminal justice system, the Committee is only concerned with a limited class of persons and it also lacks the authority to seek a conviction on any charge other than contempt.
 
 B. The Complaint
 
 1
 Morton and Barbara Simons, plaintiffs and appellants, are attorneys licensed to practice law in New York who maintain an office in the District of Columbia. Although their practice in the District is exclusively before federal courts and agencies, this limitation is explained in neither their telephone listing nor their stationary. Commencing in April 1974, the Committee challenged the Simonses' right to maintain a law office in the District. Evidently, the Committee believed that, by virtue of their phone listing and stationery, the Simonses improperly held themselves out as authorized to practice law in the District of Columbia. An inquiry into the Simonses' practice ensued and, in due course, Mr. Simons was subpoenaed to appear before the Committee. Eventually, in May 1977, the Committee completed its inquiry without taking further action; by letter dated May 9, 1979, the Committee's chairman notified the Simonses:
 
 
 2
 "From your testimony the Committee has concluded that your practice is exclusively before the federal agencies and in related matters before the federal courts. The Committee has further concluded that while your letterhead and telephone listing constitute a technical violation of Rule 46 II, in view of all the surrounding circumstances, there has been no prejudice to the public and therefore no occasion for the Committee to take further action.
 
 
 3
 "Accordingly, the Committee has completed its investigation and has closed its file."
 
 
 4
 While the Committee was researching the matter and deliberating the need for seeking legal relief, the Simonses brought this suit. They alleged that the Committee had harassed them in violation of the first, fifth and fourteenth amendments as well as article VI, cl. 2 of the United States Constitution.[3] Although the Simonses' initial complaint sought declaratory, injunctive and monetary relief, the Committee's decision not to go forward with its suit rendered moot the declaratory and injunctive portions of the Simonses' claim. By order of March 3, 1978, the motions panel of this Court granted summary affirmance to the dismissal of the claims for injunctive and declaratory relief.[4] The remainder of the Simonses' complaint seeks to recover $150,000 in compensatory damages and an identical sum in punitive damages.
 
 
 5
 By order of October 19, 1975, the district court dismissed the Simonses' case for lack of subject matter jurisdiction. The Simonses appealed the dismissal, and, a year later, this Court reversed the judgment of the district court and remanded with instructions "to defer further action for a reasonable period of time to afford appellants an opportunity to obtain a definitive ruling as to whether their activities violate the rules of the District of Columbia Court of Appeals governing the practice of law, and to allow the unauthorized practice of law proceedings to be concluded." Simons v. Bellinger, 177 U.S.App.D.C. 270, 543 F.2d 417 (D.C.Cir.1976) (unpublished opinion). On remand, the district court entered a protective order barring all discovery until the Committee issued a definitive ruling regarding the Simonses' allegedly unauthorized practice of law. After the Committee completed its inquiry, the defendants moved for summary judgment and the district court entered an order granting their motion. C.A. No. 75-1164, Order (D.D.C. Sept. 6, 1977). The Simonses have appealed this order.
 
 C. The District Court's Order
 
 6
 The district court's order deals tersely with the issue presented by this appeal. Ruling on the Simonses' right to monetary relief, the trial judge concluded that the "actions of Defendants in investigating Plaintiffs' practice of law were reasonable and within their lawful authority." C.A. No. 75-1164, Order, slip op. at 3 (D.D.C. Sept. 6, 1977). Apparently, the district court found that the defendants were entitled to a qualified immunity i. e., immunity only for acts done reasonably and in good faith. Yet, it is clear that the good faith of the defendants was the single most disputed material fact in the case. Thus, absent a finding that the defendant Committee members are entitled to a more protective immunity, the district court's order would have to be reversed. Before this Court, the defendants have renewed their argument that, under all the circumstances of this case, they are entitled to absolute immunity. Because we are persuaded that the defendants are essentially correct, we affirm the judgment of the district court.
 
 
 7
 II. UNDER THE CIRCUMSTANCES OF THIS CASE, THE COMMITTEE
 
 MEMBERS ARE ENTITLED TO ABSOLUTE IMMUNITY
 A. The Immunity Doctrine
 
 8
 The sound operation of the judicial process requires that those most closely associated with the system be afforded some immunity from monetary damages in civil actions. Although immunity must, of course, vary with both the status and activities of each particular official, judges, prosecutors, and jurors have all been recognized as deserving some form of immunity. In Pierson v. Ray, 386 U.S. 547, 553, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Court explained, "Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction." See also Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871). Prosecutors have been regarded as "quasi-judicial" officers entitled to the same absolute immunity as judges when their "activities (are) intimately associated with the judicial phase of the criminal process." Imbler v. Pachtman, 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976). This Court has recognized that public policy dictates that absolute immunity is not appropriate for prosecutors when they are "engaged in essentially investigative as opposed to advocatory activities." Briggs v. Goodwin, 186 U.S.App.D.C. 179, 190, 569 F.2d 10, 21 (D.C.Cir.1977), cert. denied, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978). Thus, bona fide investigative officers, even those acting under the title of "prosecutor," are only entitled to qualified immunity for acts performed within the scope of their authority; under this type of immunity, officials are protected from liability if their acts are reasonable and performed in good faith.
 
 
 9
 The distinctions drawn in Briggs accurately portray the flexibility of the immunity doctrine, a flexibility which calls upon the court to weigh such factors as the status of the defendant, the nature of the alleged acts and, above all, the utility of a grant of immunity. In Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court recently analyzed the considerations which a court must weigh in determining the utility of a grant of immunity. Butz involved claims of immunity by several Department of Agriculture employees who had played a part in an unsuccessful attempt to revoke the registration of a commodity futures commission merchant named Arthur N. Economou. The individuals sued by Mr. Economou were all members of the executive branch; they included the Secretary of Agriculture, the chief hearing examiner who had presided over the proceeding, the Department of Agriculture attorney who had prosecuted the enforcement proceeding, and several auditors who had conducted the investigation. 438 U.S. at 482, 98 S.Ct. 2894. In evaluating their claims of immunity, the Court explained, "(O)fficials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." Id. at 506, 98 S.Ct. at 2911. The Court's public policy evaluation involves three factors. First, "the functional comparability" of an official's judgments to those of a judge is a sine qua non of falling within the umbrella of "quasi-judicial immunity." Id. at 512, 98 S.Ct. 2894. Second, the nature of the controversy in which the official is forced to become a participant must be sufficiently intense so that there is a realistic prospect of continuing harassment or intimidation by disappointed litigants. Id. And, third, the system in which the official operates must contain safeguards adequate "to reduce the need for private damage actions as a means of controlling unconstitutional conduct." Id. Applying these factors, the Court held that adjudication within a federal administrative agency is sufficiently similar to the judicial process so that government participants in such adjudication should be afforded immunity.
 
 
 10
 We find that under the circumstances of this case, the application of these factors to the work of the defendant Committee members also warrants a grant of immunity. Moreover, we find that, here, the only appropriate immunity is one which is absolute.
 
 B. Immunity for Bar-Related Prosecutions
 
 11
 The Simonses argue that, by title alone, the Committee members are neither judges, prosecutors, jurors nor witnesses and, accordingly, they may not benefit from any of the immunities commonly afforded those participants in the legal process. The lesson of Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), however, is plainly to the contrary. It does not matter that we are unable to cast the defendants in any of these familiar roles; if the Committee's unique role is sufficiently similar to that of its more well-known counterparts, then we must recognize that some form of immunity is appropriate. In this fashion, the Supreme Court has extended immunity, in varying degrees, to members of the executive branch who participate in the administrative adjudicatory process. Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), on remand, 466 F.Supp. 1351 (S.D.N.Y.1979). In this case, we find that the Committee members primarily resemble prosecutors but, because they also possess some of the characteristics of an inherent judicial power, we must recognize more than their prosecutorial function in evaluating their need for immunity.
 
 
 12
 The defendant Committee members resemble prosecutors for the simple reason that they are charged with the responsibility of initiating disciplinary actions. Like prosecutors, they not only start litigation, but also prepare cases, conduct trials, and negotiate settlements. Indeed, the parallel between prosecutors and bar association committees which, like the defendants, police the legal profession, is well established. In Dacey v. New York County Lawyers Association, 423 F.2d 188 (2d Cir. 1969), aff'g 290 F.Supp. 835 (S.D.N.Y.1968), cert. denied, 398 U.S. 929, 90 S.Ct. 1819, 26 L.Ed.2d 92 (1970),[5] the Second Circuit reviewed a claim of immunity by a bar association which had instituted legal proceedings charging a non-lawyer, who wrote on legal subjects, with the unauthorized practice of law; the court concluded, "We are of the view that when the Association instituted its proceedings against Dacey, its role was analogous to that of a public prosecutor." 423 F.2d at 192. The recognition of this similarity has been a critical factor in the courts' virtually unanimous recognition of the immunity afforded individuals duly authorized to enforce rules regarding bar membership. Indeed, plaintiffs have not presented this Court and we are unable to find a single case in which committee members similar to the defendants were held liable for their conduct.
 
 
 13
 A review of the relevant precedent is instructive. In Clark v. State of Washington, 366 F.2d 678, 681 (9th Cir. 1966), the court held that when the Washington State Bar Association instituted a disciplinary proceeding, it acted as an "integral part of the judicial process." In this role, the court concluded, it was entitled to the same immunity afforded the state's prosecuting attorneys. 366 F.2d at 681. The Seventh Circuit followed Clark in Kissell v. Breskow, 579 F.2d 425 (7th Cir. 1978), a suit against the executive secretary of the Disciplinary Commission of Indiana. The executive secretary of the Commission is appointed by the Indiana Supreme Court and is empowered to investigate and prosecute misconduct by Indiana attorneys. In Kissell, the plaintiffs charged that the disciplinary suit instituted by the executive secretary had violated their constitutional rights. The court, however, found that the defendant was "in a position analogous to that of a prosecuting attorney" and thus protected by "quasi-judicial absolute immunity." 579 F.2d at 428. The holdings in Kissell and Clark accurately reflect a persuasive and well-reasoned line of authority. See Mayes v. Horn, 542 F.2d 822, 824 (10th Cir. 1976); Ginger v. Circuit Court for County of Wayne, 372 F.2d 621, 625 (6th Cir.), cert. denied, 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 998 (1967); Campbell v. Washington State Bar Association, 263 F.Supp. 991 (W.D.Wash.1967) (three-judge court); Niklaus v. Simmons, 196 F.Supp. 691, 714 (D.Neb.1961). Individuals who serve in capacities similar to those of Committee members are certainly protected by some form of immunity, either qualified or absolute.
 
 
 14
 Although other courts have drawn the analogy between a Committee member and a prosecutor and relied upon that rough similarity to grant absolute immunity we do not accept the proposition that the defendants are, for immunity purposes, precisely identical to prosecutors. The clear lesson of Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), is that immunity may not be determined by a simple resort to status or title. Rather, Butz demands that both the allegations against the defendant and the precise nature of the defendant's work be examined in light of the three factors previously discussed. We turn now to that evaluation.
 
 C. The Scope of the Committee's Immunity
 
 15
 Having determined that the Committee merits the protection of immunity, the key question becomes whether that immunity should be qualified or absolute. The rough analogy between the Committee's function and that of a prosecutor suggests that the investigative/advocatory dichotomy adopted by this Circuit in Briggs v. Goodwin, supra, should apply to the activities of Committee members. We accept the proposition that Briggs offers significant guidance on the immunity issue, but we note that when immunity is at issue, bright line distinctions are virtually impossible. Butz indicates that each case must be examined on its own facts. In lieu of a mechanical application of either Briggs or the prosecutorial analogy, we conduct such an examination, applying the three factors employed in Butz.
 
 
 16
 Under Butz, the first criterion which we must consider is whether the Committee's judgments upon which the Simonses have brought suit possess a "functional comparability . . . to those of a judge." We find that they possess this vital characteristic in two respects. First, and most significantly, the Committee members were clearly engaged in preparing and, perhaps, initiating, a particular lawsuit a critical phase of any prosecution. Second, in assessing whether to initiate a prosecution, the Committee was performing, by delegation, the inherent judicial function of determining who is authorized to practice law.
 
 
 17
 In Imbler v. Pachtman, 424 U.S. 409, 431, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Court held that "in initiating a prosecution," a state prosecutor's decision was sufficiently comparable to a judicial judgment to merit absolute immunity. Like a judge, the prosecutor was involved in the sensitive process of starting and stopping litigation. Although this Court has ruled that a prosecutor cast in the role of an investigator is entitled to qualified immunity, the Court in Imbler noted:
 
 
 18
 We recognize that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.
 
 
 19
 Id. at 431 n.33, 96 S.Ct. at 995 n.33 (emphasis added). Thus, even when a prosecutor acts outside the courtroom, in territory more commonly patrolled by investigative officers, he may, on occasion, still benefit from a grant of absolute immunity. By analogy to prosecutors, the Committee members' out-of-court contact with the Simonses may also be fully protected and under the facts of this case, such protection is appropriate.
 
 
 20
 The Committee's entire dealings with the Simonses were certainly directed toward a determination of whether the initiation of formal proceedings would be appropriate. Here, the Committee members had passed beyond a mere search for the signs of illegal conduct and even beyond an investigation for the perpetrators of that conduct. From their first contact with the Simonses, the members had already established a prima facie case: the Simonses had an office in the District and they were not members of the local Bar.[6] The subpoena served upon Mr. Simons, and other methods which the Committee employed to gather information, were all part of the members' attempt to determine whether or not the Simonses' apparent violation warranted a formal prosecution. The decision of whether or not to prosecute is well-recognized as a determination which is comparable to judicial decisionmaking and which also requires the full protection of absolute immunity. In this instance, the Committee members deserve no less. Having genuinely focused upon particular defendants and a particular wrong, the Committee is entitled to absolute immunity when it makes inquiries necessarily antecedent to its determination regarding prosecution. In this sense, the Committee members were, in reality, advocates preparing for a particular lawsuit.[7] Indeed, absent immunity, the Committee could only be protected by actually initiating a formal proceeding against every apparent violator.
 
 
 21
 The Committee members' work is functionally comparable to the work of judges in a second respect. They serve as an arm of the court and perform a function which traditionally belongs to the judiciary. In this sense, the Committee's efforts to ascertain those practicing law without proper authority are judicial efforts. The court's power to determine who may appear before it was aptly summarized by Chief Justice Taney in Ex Parte Secombe, 60 U.S. (19 How.) 9, 13, 15 L.Ed. 565 (1856):
 
 
 22
 And it has been well settled, by the rules and practice of common-law courts, that it rests exclusively with the court to determine who is qualified to become one of its officers, as an attorney and counsellor, and for what cause he ought to be removed. The power, however, is not an arbitrary and despotic one, to be exercised at the pleasure of the court, or from passion, prejudice, or personal hostility; but it is the duty of the court to exercise and regulate it by a sound and just judicial discretion, whereby the rights and independence of the bar may be as scrupulously guarded and maintained by the court, as the rights and dignity of the court itself.
 
 
 23
 The Court of Appeals for the District of Columbia has put the matter more bluntly: "No one denies that a court has an inherent right to make rules governing the practice of law before it. And courts, including those in this jurisdiction, have promulgated rules concerning who may practice law before them."[8] In Laughlin v. Clephane, 77 F.Supp. 103, 105-06 (D.D.C.1947), a suit against the Committee on Admission and Grievances, the predecessor of the defendant Committee, the district court analyzed the special relationship between judges and the attorneys whom they appoint to assist them in policing the Bar:[9]
 
 
 24
 The District Court exercised not only an inherent power but a statutory right to promulgate rules with respect to admissions of attorneys to practice at its bar. In doing this it had a right to call to its assistance the Committee designated as a Committee on Admissions and Grievances. It would be idle to exercise a power to admit to the bar unless it at the same time exercised power of supervision, and, in proper cases, order disbarments.
 
 
 25
 Thus, the Committee acts as a surrogate for those who sit on the bench. Indeed, were it not for the Committee, judges themselves might be forced to engage in the sort of inquiries which the plaintiffs have put in issue. In sum, the Committee members, as a bona fide arm of the Court of Appeals of the District of Columbia, must almost by definition make decisions comparable to those of a judge.[10] The near-judicial nature of their work and the comparability, in this case, of that work to the protected efforts of a prosecutor point strongly to the appropriateness of a grant of absolute immunity.
 
 
 26
 A second factor established in Butz v. Economou, supra, also supports a grant of absolute immunity in this case. In Butz, the Court explained that absolute immunity would only be appropriate in situations where the officials who participate in the process of adjudication are likely to become defendants in later suits brought by litigants embittered by the outcome in the original forum. 438 U.S. at 512, 98 S.Ct. 2894, 2913-14. The Court explained, "(C) ontroversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus." Id. Absolute immunity, of course, protects officials from this inevitable harassment.
 
 
 27
 Like judges and prosecutors, the defendant Committee members are probable targets for harassing lawsuits. Indeed, because the Committee only prosecutes those who purport to be attorneys, its members might well be more likely targets for such litigation than either judges or prosecutors. Both legitimate and unauthorized practitioners alike may be expected to use their familiarity with the legal process to explore the possibility of vindication either real or imagined in other forums. Moreover, once the Committee has focused its inquiry upon a particular suspect, as in this case, its members become even more probable targets for harassment. Accordingly, absolute immunity is an appropriate shield. Perhaps, without this immunity, membership on the Committee would be transformed from a distinguished achievement in public service into an invitation to become a defendant in costly, time-consuming litigation.
 
 
 28
 The final factor considered by the Court in Butz was the existence of "safeguards built into the judicial process" which are sufficient to eliminate the need for private damage actions as a means of curbing unconstitutional conduct. 438 U.S. at 512, 98 S.Ct. at 2914. All of the safeguards noted by the Court in Butz are available to check improper conduct by the Committee. All proceedings instituted by the Committee are conducted before an impartial judge of the Court of Appeals of the District of Columbia, they are adversary in nature, and they are subject to appellate review by the entire Court of Appeals. In addition, the Committee's prosecutorial powers are severely curtailed by limitations which the Court of Appeals has placed upon the remedies which the Committee may seek: violations of D.C.Ct.App. R. 46 II (b)(1) are only punishable by contempt and/or subject to injunctive relief. Moreover, under D.C.Ct.App. R. 21(a), the defendant Committee members are "officers" subject to writs of mandamus; these writs effectively restrain improper action without adding the extra deterrent of monetary damages. Finally, because the Committee members are appointed by the Court of Appeals for brief three-year terms, safeguards are "built into the judicial process " at the time of appointment. In sum, the Committee and its members are subject to numerous checks capable of deterring, or correcting, unconstitutional conduct.[11] The presence of these checks reduces the need for private causes of action and thereby renders absolute immunity appropriate.
 
 
 29
 Upon a consideration of all three factors mandated by Butz, we find defendant Committee members are entitled to the protection of absolute immunity.
 
 
 30
 The Simonses argue strenuously that the Committee members are, at most, entitled to the immunity afforded prosecutors and further that the members were engaged in purely investigatory activity which under Briggs v. Goodwin, supra, is subject to a qualified immunity. Under a qualified immunity, the "good faith" of the defendant Committee members would clearly be a material fact in dispute and we would have to reverse the judgment of the trial court. For two reasons, we decline to accept appellants' contentions.
 
 
 31
 First, as we have pointed out, the immunity doctrine is flexible, calling for a broad consideration of several factors. In weighing these factors, we have found that the defendants may be analogous to prosecutors, but they are not, in all respects, identical to their more familiar counterparts. The defendants may, on occasion, perform a function which is more "judge-like" than the work of prosecutors; in addition, their authority is more limited and their work subject to closer judicial supervision. Finally, the Committee members may even be more likely targets for harassing lawsuits than prosecutors. Thus, appellants' simplistic assertion that the Committee members are identical to prosecutors is unacceptable. In contrast, we find that there are differences between the Committee members and prosecutors and these differences must be weighed in determining the appropriate immunity. Further, we find these differences provide persuasive support for a grant of absolute immunity.
 
 
 32
 Appellants are also incorrect in claiming that under the investigatory/advocatory dichotomy established in Briggs v. Goodwin, 186 U.S.App.D.C. 179, 569 F.2d 10 (D.C.Cir.1977), cert. denied, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978), the Committee's inquiries were merely investigatory. In Briggs, this Court reviewed the conduct of a federal official who had been specially appointed to investigate and prosecute certain federal crimes committed by "various persons" in the Northern District of Florida, 186 U.S.App.D.C. at 182, 569 F.2d at 13. The prosecutor subpoenaed twenty members of the Vietnam Veterans Against the War (VVAW) and ordered them to appear before a grand jury. The subpoenaed individuals were concerned with the presence of turncoats at meetings with their attorneys, and they promptly moved in the district court to compel disclosure of any federal agents or informants within their midst. At a hearing on the motion, the prosecutor took the witness stand and allegedly falsely declared that none of the witnesses before the grand jury were agents or informants of the United States of America. Although the twenty subpoenaed individuals never testified before the grand jury, at the conclusion of the four-day proceeding, six of them were indicted on a variety of counts centering around an alleged conspiracy to unlawfully disrupt the 1972 Republican National Convention. Id. 186 U.S.App.D.C. at 182-183, 569 F.2d at 13-14. Later, ten VVAW activists, including the six indicted by the grand jury, brought suit against the prosecutor, claiming injury arising out of his alleged perjury at the hearing on the motion.
 
 
 33
 In reviewing the prosecutor's assertion of absolute immunity, this Court held, first, that "(W)hen a prosecutor is engaged in essentially investigative as opposed to advocatory activities, the consideration of public policy which necessitated a grant of absolute immunity in Imbler no longer control." Id. 186 U.S.App.D.C. at 190, 569 F.2d at 21. It held further that at the time of the prosecutor's testimony, his conduct was merely investigative:
 
 
 34
 (A)ppellant's primary task in Florida was to determine whether any violations of federal law properly attributable to the VVAW or its members had occurred. If any such federal crimes had been committed, Goodwin was to ascertain the precise nature of those crimes, and the identity of VVAW members to whom criminal liability might attach. The grand jury was to function in the first instance as an investigative tool, rather than in its more familiar guise as a deliberative body deciding whether to return indictments for specific crimes on the basis of evidence gathered and presented by a public prosecutor. The grand jury proceeding in this case was designed as a broad scale investigation into possible illegal activity by the VVAW or its members.
 
 
 35
 Id. 186 U.S.App.D.C. at 193, 569 F.2d at 24. Thus, Briggs directs us to look beyond both the guise and setting of the prosecutor's activity[12] and to examine, instead, the maturity of his investigation.[13] At some point, the prosecutor's inquiry becomes sufficiently focused so that he is preparing a case against a particular defendant rather than seeking a defendant against whom he may prepare a case.[14] At this point, his efforts become advocatory: they are intimately associated with the sensitive decision of whether or not to initiate a particular prosecution, a decision which is left to advocates, not investigators.
 
 
 36
 The activity of the Committee in this case differs from that of the prosecutor in Briggs because it had focused upon both a set of defendants and a specific wrong. When the inquiry commenced, the Committee had already ascertained that the Simonses were holding themselves out as attorneys despite their lack of membership in the local bar. A prima facie case had been established and the Committee was trying to determine whether the apparent violation was genuine and, if so, whether it warranted a formal proceeding. The Committee members were neither searching randomly for violations nor ascertaining whether the Simonses had ever committed a violation. The Committee already possessed the type of information which a police investigation might gather and its attention had turned to the delicate issue of initiating a prosecution.
 
 
 37
 Briggs is clear in its declaration that prosecutorial activity is absolutely immune when it becomes focused upon a "particular criminal proceeding."[15] In discussing Imbler's acknowledgment that some prosecutorial work outside the courtroom may be absolutely immune, see 424 U.S. at 431 n.33, 96 S.Ct. 984, this Court explained:
 
 
 38
 Although . . . a prosecutor's advocacy function does extend beyond the confines of the trial courtroom, the examples of such preliminary advocate activities provided by the Supreme Court are instructive for their common focus on a particular criminal proceeding. By the plain import of the Court's remarks, absolute immunity under Imbler extends only so far as necessary to protect a prosecutor's decision with respect to the initiation and conduct of particular cases. Imbler does not, in our reading, immunize prosecutors for any and all measures they may undertake in the course of wide-ranging law enforcement investigations or general fact-finding expeditions.
 
 
 39
 186 U.S.App.D.C. at 188-189, 569 F.2d at 19-20 (emphasis added). Here, absolute immunity is appropriate for the Committee's out-of-courtroom activity because that activity was related to the Committee's decision to initiate a particular case. Significantly, on remand, the trial court in Butz v. Economou, 466 F.Supp. 1351, 1359 (S.D.N.Y.1979) applied a standard similar to the one provided by Briggs. The trial court granted absolute immunity to all Department of Agriculture officials who both reviewed the original auditor's report indicating the existence of a violation, and participated in the decision to commence the disciplinary proceeding. The Committee members in this case likewise participated in the decision regarding the prosecution, and they also made inquiries of the targets of the potential prosecution. We find that their activities were sufficiently focused upon a particular proceeding so that they were not serving as mere investigators. Rather, they were preparing a case for trial and in this role, absolute immunity is more than appropriate.[16]
 
 
 40
 III. THE COMMITTEE MEMBERS WERE ACTING WITHIN THEIR JURISDICTION
 
 
 41
 Having determined that the Committee members are entitled to absolute immunity, we must affirm unless plaintiffs have alleged facts which indicate that the Committee was acting outside the scope of its jurisdiction. The Simonses assert that the exclusively federal nature of their legal practice places them beyond the authority of any local bar committee.[17] Thus, they conclude, the Committee was acting beyond its jurisdiction throughout its inquiry into the propriety of their conduct.
 
 
 42
 Appellants, however, fail to comprehend the special meaning which the word "jurisdiction" assumes when immunity is at issue. The Supreme Court has declared that, with respect to immunity, "jurisdiction" ought to be defined broadly to include acts "having more or less connection with the general matters committed by law" to the official's supervision. Spalding v. Vilas, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896). In other words, an act is within the official's jurisdiction if it is not "manifestly or palpably beyond his authority." Id. In Briggs v. Goodwin, this Court also held that a broad interpretation of jurisdiction is necessary to guarantee a genuine benefit from the grant of immunity. It noted, "(A)ny allegation that an official, acting under color of law, has deprived someone of his rights necessarily implies that, in the particular case, the official exceeded his authority." 186 U.S.App.D.C. at 184, 569 F.2d at 15. The Court explained further that to accept such an allegation as by itself stating a claim, "would completely abrogate the doctrine of immunity." Id.
 
 
 43
 In this case, the Committee members performed activities which were not manifestly beyond their authority. Their inquiry regarding the Simonses' practice was plainly within the general matters which the District of Columbia Court of Appeals has committed to the Committee's discretion. Accordingly, we hold that the Committee at all times acted within its jurisdiction.
 
 IV. CONCLUSION
 
 44
 Based upon our finding of absolute immunity, we affirm the judgment of the district court. The Committee members are certainly officials who warrant some type of immunity and, in view of the circumstances of this case, absolute immunity is appropriate. The defendants here were gathering information after an apparent violation had come to their attention and the information they sought was critical to their decision regarding the prosecution of a particular case. In addition, the Committee members at all times acted within the scope of their authority. Accordingly, plaintiffs' suit for injuries arising out of the Committee's work is barred, and the judgment of the district court is hereby affirmed.
 
 
 45
 Affirmed.
 
 MacKINNON, Circuit Judge (concurring):
 
 46
 My views concur with the result reached by the opinion by Judge Richey[1] that the Committee on Unauthorized Practice, as appointed by the District of Columbia Court of Appeals[2], has absolute immunity in exercising the inherent judicial power delegated to it by the court in determining compliance with the laws and rules governing the practice of law in the District of Columbia. I would also agree with the rationale of Judge Richey's opinion if the investigative/advocatory dichotomy was the sole consideration. However, I write separately because I consider the outcome of this case as being controlled by the recent decision of the Supreme Court in Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)[3] which I consider to be a stronger basis for decision.
 
 
 47
 The members of the Unauthorized Practice of Law Committee of the District of Columbia Court of Appeals are appointed by the "Court" and the Committee's rules become operative only with "the approval of the Court."[4] Therefore, it is my opinion that the Committee members must be considered to be officers of the Court in carrying out their assigned responsibilities, since they exercise directly delegated judicial jurisdiction, are appointed by the Court to act in such capacity and "receive such compensation and necessary expenses as the Court may approve."[5] Of course, all attorney's are "officers of the Court" but the Committee members in exercising their delegated jurisdictions here served as "officers" of the Court in an additional capacity that was principally judicial. Appellants are thus clearly in error in their contention that the members of the Committee are nothing more than "lawyers in private practice" who receive no compensation "paid from the public fisc."[6]
 
 I. FACTUAL BACKGROUND
 
 48
 A. The Statute and Rules.
 
 
 49
 Congress, by statute, has authorized the District of Columbia Court of Appeals by "rules " to regulate the admission, censure, suspension and expulsion of members of its bar:
 
 
 50
 (a) The District of Columbia Court of Appeals shall make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and expulsion.
 
 
 51
 (b) Members of the bar of the District of Columbia Court of Appeals shall be eligible to practice in the District of Columbia courts.
 
 
 52
 (c) Members of the bar of the United States District Court for the District of Columbia in good standing on April 1, 1972, shall be automatically enrolled as members of the bar of the District of Columbia Court of Appeals, and shall be subject to its disciplinary jurisdiction. (July 29, 1970, Pub.L. 91-358, § 111, title I, 84 Stat. 521.)
 
 
 53
 D.C.Code, § 11-2501, 84 Stat. 521.
 
 
 54
 This confers essentially identical authority upon the District of Columbia Court of Appeals over the practice of law, as is exercised by the Supreme Courts of the states, a detailed discussion of which is contained in Judge Delhant's outstanding opinion in Niklaus v. Simmons, 196 F.Supp. 691 (D.Neb.1961). Pursuant to this authority of the District of Columbia Court of Appeals by rule has integrated the Bar of the District of Columbia, has approved such rules and regulations as it deemed necessary to carry out the provisions of its rule relating to the Unauthorized Practice of Law in the District of Columbia, and has appointed the Committee on the Unauthorized Practice of Law, the members of which are the appellees here.
 
 
 55
 The District of Columbia Court of Appeals Rules relating to the Unauthorized Practice of Law were promulgated following the establishment of the Court by the District of Columbia Court Reorganization Act of July 29, 1970, P.L. 91-358, 84 Stat. 475, D.C.Code 11-101 et seq. See specifically, § 11-701 et seq. The Rule in force when this action was started was adopted on September 28, 1973 and is set forth in the margin.[7]
 
 
 56
 Paragraph (5) of that rule expressly recognized the right of practitioners who are duly authorized to appear before federal agencies to do so without being required to become members of the District of Columbia Bar but prohibited persons who were not enrolled to practice law in the District of Columbia from regularly engaging in the practice of law in the District of Columbia, or in holding themselves out in any manner as so authorized or qualified.
 
 
 57
 The 1973 rules were subsequently modified in some respects on November 6, 1975. Since the events here transcended both rules the modified rules are also set out.[8] After amendment the prohibition against nonadmitted persons from regularly engaging on the practice of law or from holding themselves out as authorized to do so was retained in haec verba, but paragraph (5) was replaced with paragraph (7) reading as follows:
 
 
 58
 (7) Nothing herein shall prohibit any person from practicing before any department, commission, or agency of the United States to the extent that such practice is authorized by any rule or regulation of any such department, commission or agency, provided the person is not otherwise regularly engaged in the practice of law in the District of Columbia or is not in any manner, except as permitted by the license granted by such department, commission or agency, holding himself out as authorized or qualified to practice law in the District of Columbia without having become an enrolled active member of the Bar. This rule shall not be construed to repeal, supersede or modify any law, rule or regulation which relates to practice before any department, commission or agency of the United States.
 
 
 59
 On July 18, 1975 when appellant's complaint was filed, the Rules of the District of Columbia Court of Appeals set forth a description of some of the acts which constituted the "practice of law."[9] This Rule was subsequently amended on November 6, 1975, as set forth above.[10]
 
 
 60
 (B) The Simonses' Practice.
 
 
 61
 On April 12, 1974 the District of Columbia Court of Appeals Committee on Unauthorized Practice of Law sent a letter to Mr. Simons pointing out that the District of Columbia Bar had furnished the Committee with his name as one of the persons who through "some type of listing, such as the telephone directory, appear to be holding themselves out as attorneys in the District of Columbia"[11] in possible violation of Rule 46 II (b)(6).
 
 
 62
 Mr. Simons responded by a letter dated April 17, 1974 that he was admitted to practice in the New York State Courts, the Supreme Court of the United States and the United States Courts of Appeals for the District of Columbia, Fifth and Tenth Circuits. He also asserted that his practice was before the federal agencies, primarily the Federal Power Commission, and the federal appellate courts on review of federal agency actions. While acknowledging that he was not admitted to practice before the local courts in the District of Columbia he asserted that "I have never held myself out as authorized to practice before the local courts of the District of Columbia or to advise on local law nor have I at any time engaged in such practice".[12] He added further, "I certainly do not regard the listing of my name as a lawyer in the Washington telephone directory as a representation that I practice, or intend to practice, in the local court system."[13] He did not, however, contend that his listing in the Washington telephone directory under "Lawyers" did not constitute a "holding out (that he was) authorized to practice law in the District of Columbia."
 
 
 63
 The Chairman of the Committee on Unauthorized Practice, Mr. Edgar T. Bellinger, replied on April 24, 1974 to Mr. Simon's letter with the contention that:
 
 
 64
 We note that you are not admitted to practice in the District of Columbia and that you indicated your practice is before federal agencies.
 
 
 65
 As you are no doubt aware, if one engages in law practice in the District of Columbia or holds himself out as authorized to practice law in the District of Columbia he must be a member of the District of Columbia Bar. Law practice, of course, includes law practice involving federal agencies and Appellate Courts. It is not limited merely to appearances before the local courts or general practice involving local law.
 
 
 66
 Furthermore, it should be noted that in both the telephone book and your stationery you refer to yourself as a lawyer (with a Law office in the District of Columbia but) with no indication that you are not admitted in the District of Columbia. Both constitute means of holding out the right to practice in this jurisdiction.
 
 
 67
 Accordingly, you should take steps to become properly admitted to practice in this jurisdiction or cease any holding out as an attorney in the District of Columbia or the maintenance of a law office in the District of Columbia.[14]
 
 
 68
 Mr. Simon countered that the decision of the United States Supreme Court in Sperry v. Florida, 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963) was controlling in the matter, allowed him to so hold out and subsequently in a letter of February 17, 1975 he more fully asserted this position. Previously on December 2, 1974, Mr. Bellinger had suggested a personal conference might resolve the matter.
 
 
 69
 By letter of March 4, 1975, Mr. Bellinger set forth the Committee's understanding of Mr. Simon's position:
 
 
 70
 We understand from your letter that you take the position that your law practice is limited to administrative law practice, and that, as a result, you are not subject to the jurisdiction of the (District of Columbia) Court. You therefore are declining to seek to become qualified to practice law in this jurisdiction, and will continue your present practice. The Committee will consider the matter in the light of your response, and determine what course of action it deems appropriate under the circumstances.
 
 
 71
 Sometime later an attorney for the Simonses appeared before the Committee on July 9, 1975 and afterwards wrote a letter to the Chairman which discussed that meeting. It appears from that letter that the Committee might have taken the position that Rule 46 II (b)5 prohibits the maintenance of an office in the District of Columbia of the type which the Simonses asserted they maintained.
 
 
 72
 (C) The Simonses' lawsuit against the Committee Members.
 
 
 73
 While the matter was in this posture, on July 18, 1975 the Simonses brought the instant complaint against all the members of the Court's Committee on Unauthorized Practice of Law, for a temporary restraining order, declaratory injunction and other relief.[15] The complaint alleged jurisdiction under 28 U.S.C. § 1331(a), 2201 and 2202 and alleged that the appellants did not, and had not appeared before the Superior Court of the District of Columbia of the District of Columbia Court of Appeals, or their predecessor courts and that the appellants had never rendered legal advice on any matter of local law. The complaint also alleged that plaintiffs' clients were all located outside the District of Columbia.[16] The gist of the Simonses' cause of action was set forth in paragraph 8 of the complaint:
 
 
 74
 The defendants are interfering with the plaintiffs' right and license to practice before the Federal Power Commission and the Federal Courts in violation of the Supremacy Clause. Their right to practice before the Federal Power Commission and the Federal Appellate Courts are set forth in 28 U.S.C. § 2071; Supreme Court Rule 5; Federal Rules of Appellate Procedure Rule 46; United States Court of Appeals for the District of Columbia Circuit Rule 5; 15 U.S.C. § 717 o; 18 C.F.R. § 1.4.
 
 
 75
 The complaint also broadly alleged violations of the plaintiffs' rights under the Fifth and Fourteenth Amendments, and of plaintiff's right to freedom of travel, speech and association. The complaint further alleged that the defendants were denying plaintiffs due process of law by stigmatizing them as being engaged in the unauthorized practice of law.
 
 
 76
 (D) The Relevant Issues.
 
 
 77
 The procedural history of the Simonses' action is set forth in detail in Judge Richey's opinion and it is unnecessary to duplicate it here. As there indicated we are dealing with the Simonses' appeal from the grant of summary judgment dismissing their complaint. At the time the complaint was filed the Committee had decided to drop the Bar Association's complaint. Two views are now advanced which would have us arrive at different results in deciding the appeal. One view is that the Committee and its acts are to be characterized in the investigatory/advocatory dichotomy as being investigative in nature and entitled only to qualified immunity. The other view is that the character of the Committee and its acts when considered in the same dichotomy are quasi-judicial in character. According to this view the Committee had sufficiently focused on a particular case so that absolute immunity attaches to the Committee's actions.
 
 
 78
 I agree with this latter conclusion because I do not consider the Committee's acts to have been in the investigative category. So far as the suggested dichotomy is concerned the investigative phase of the case was completed, by the Bar Association, before the Committee began its consideration of the matter. Under such circumstances, since the Committee was exercising actual judicial authority, as delegated to it by the Court of Appeals, it is unnecessary to engage in any dissection of the Committee's action into investigatory and advocatory activities.
 
 
 79
 This matter came before the Committee for decision when the Bar Association reported to the Committee that the Simonses were not admitted to the D.C. Bar, yet were listing themselves in the District of Columbia telephone directory as "Lawyers". Following a letter from the Committee, the Simonses admitted these facts but contended their listing was proper because they limited their practice to federal courts and agencies before which they were admitted to practice. That was all the investigation that was necessary before the Committee could proceed to hear the matter and decide what course to take. The essential issue to be decided was whether such unrestricted "holding (themselves) out" within the District of Columbia as "Lawyers" was a sufficient showing of probable cause of a violation of the Rule to justify a decision that the case should be presented to "a judge of (the District of Columbia Court of Appeals) designated by the Chief Judge and (the decision thereon would be) subject to review in the usual appellate practice upon application . . ."[17].
 
 
 80
 In hearing that matter and making the decision that the matter should be dropped the members of the Committee were acting in substantially the same capacity, and making essentially the same decision as a Magistrate in a preliminary hearing, i. e., determining whether probable cause had been shown that a violation had been committed. If the matter under consideration had been more egregious, the Committee could have been considered to be acting in much the same capacity as a Grand Jury which generally only considers felonies.
 
 
 81
 In functioning as it did the Committee members were acting in a judicial capacity and are entitled to absolute immunity. The case had proceeded beyond the stage where it was investigatory. In this latter respect I agree with Judge Richey's opinion that the type of investigation that is referred to as being subject to only qualified immunity is that akin to police work, search and seizure, and the like.
 
 
 82
 The court in Briggs v. Goodwin, 186 U.S.App.D.C. 179, 189, 569 F.2d 10, 20 (D.C.Cir. cert. denied 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1977)), stated:
 
 
 83
 As the Supreme Court observed, the Ninth Circuit's affirmance in Imbler deliberately left undisturbed earlier decisions in that court and others which had held that prosecutors are entitled to only a qualified immunity for conduct performed in an investigative or administrative capacity.
 
 
 84
 The court then cited the following cases; the material in brackets summarizes the nature of the conduct being examined in each action: Apton v. Wilson, 165 U.S.App.D.C. 22, 506 F.2d 83 (D.C.Cir.1977) (alleging planning of mass arrests during demonstration); Guerro v. Mulhearn, 498 F.2d 1249 (1st Cir. 1974) (alleged wiretapping using warrant obtained using perjured testimony); Hampton v. Chicago, 484 F.2d 602 (7th Cir. 1973) cert. den. sub nom. 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974) (alleged prosecutor participation in police raid on apartment occupied by Black Panthers with intent to deprive occupants of constitutional rights); Littleton v. Berbling, 468 F.2d 389 (7th Cir. 1972), rev'd. O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) and vacated Spomer v. Littleton, 414 U.S. 514, 94 S.Ct. 685, 38 L.Ed.2d 694 (1974) (allegations that prosecutor used criminal justice system to break boycott by blacks against white merchants allegedly engaging in racially discriminatory treatment); Dodd v. Spokane County, 393 F.2d 330 (9th Cir. 1972) (allegations that prosecutor conspired with police through intimidation to coerce plaintiff to testify falsely in criminal trial); Robichaud v. Ronan, 351 F.2d 533 (9th Cir. 1965) (alleged malicious prosecution to coerce confession); Tomko v. Lees, 416 F.Supp. 1137 (W.D.Pa.1965) (alleged coercion by prosecutor and police to force plaintiff to act as informant); Burkhart v. Saxbe, 397 F.Supp. 499 (E.D.Pa.1975) (alleged warrantless wiretapping and continuing disclosure of conversations intercepted); Madison v. Purdy, 410 F.2d 99 (5th Cir. 1969) later appeal, Madison v. Gerstein, 440 F.2d 338 (5th Cir. 1971) (allegation of conspiracy by sheriff and prosecutor to deny plaintiffs custody of their child and subjection to unlawful search); and Ames v. Vavreck, 356 F.Supp. 931 (D.Minn.1973) (alleged prosecutor involvement in raid on house and warrantless seizure of documents).
 
 
 85
 Clearly, none of these cases involve the type of activity in which the Committee was involved or remotely resembles the actions in these cases. This appeal does not present us with activity remote from the judicial process. Rather, it presents a question close to the heart of the judicial responsibility for regulating admission to the bar, and its corollary of courts policing unauthorized practice.
 
 
 86
 II. THREE RECENT DECISIONS RELATING TO IMMUNITY
 
 
 87
 The ultimate decision here brings into play three cases, two of which are from the United States Supreme Court and a case from this circuit: (1) Imbler v. Patchman, 424 U.S. 409, 96 S.Ct. 2894, 47 L.Ed.2d 895 (1976); (2) Briggs v. Goodwin, 186 U.S.App.D.C. 179, 569 F.2d 10 (D.C.Cir.1977) cert. denied sub nom. 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978); and (3) Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). A discussion of these decisions is necessary to a determination of the contradictory positions that are urged upon us by the respective parties. Imbler, a Supreme Court case and Briggs, a case in this circuit, are most strongly urged upon us in support of qualified immunity.
 
 
 88
 1. Imbler v. Patchman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) involved a damage action by a plaintiff who had been convicted of murder. The plaintiff unsuccessfully petitioned a state court for a writ of habeas corpus on the grounds of newly discovered evidence and an allegation that the prosecutor had knowingly used false testimony in obtaining a murder conviction against him. Later, a federal court released him on a writ of habeas corpus on the same showing. He then brought an action against the prosecutor and others under the Federal Civil Rights Act, 42 U.S.C. § 1983 (1976) seeking damages for loss of liberty caused by what he alleged was an unlawful prosecution. In this action the United States District Court, the Court of Appeals and the Supreme Court all held that the state prosecutor was absolutely immune from any liability for damages sought in a civil suit under § 1983 for alleged violation of Imbler's constitutional rights. The ratio decidendi of the opinion was that limiting a prosecutor to qualified immunity would operate to deprive the public of vigorous and fearless prosecution of crimes; and often would act to prejudice convicted defendants by introducing the extraneous consideration of the prosecutor's liability for monetary damages into applications for post conviction releases that should be granted solely to ensure justice.
 
 
 89
 Notwithstanding the decision that the prosecutor was entitled to absolute immunity the opinion also discussed various aspects of some activities of prosecutors that might not be so entitled. First, the court held:
 
 
 90
 We agree with the Court of Appeals that respondent's activities were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with force. We have no occasion to consider whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate. We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983. 424 U.S. at 430-31, 96 S.Ct. at 995. (footnotes omitted)
 
 
 91
 Justice Powell then added the following footnote to his opinion, in which all participating Justices joined in the judgment:
 
 
 92
 We recognize that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom. A prosecuting attorney is required constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them.
 
 
 93
 424 U.S. at 431, n.33, 96 S.Ct. at 995, n.33.
 
 
 94
 2 Briggs v. Goodwin, 186 U.S.App.D.C. 179, 569 F.2d 10 (D.C.Cir.1977), cert. denied sub nom. 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978).
 
 
 95
 In the year following Imbler v. Patchman we rendered our decision in Briggs v. Goodwin, supra, which interpreted and applied the investigatory/advocatory dichotomy to deny absolute prosecutorial immunity to a Department of Justice prosecutor who was conducting a grand jury investigation. It was alleged that he had knowingly testified falsely in open court, in answer to a single question by the judge supervising the grand jury who inquired whether any government informants were among the members of the target organization who had been subpoenaed to testify as witnesses. The prosecutor's activity in so testifying in connection with the investigation was held by the court to be of an investigatory nature, rather than advocatory, and therefore to be entitled only to qualified immunity.[18] Our decision recognized that the case was unique and was not within the ambit of those numerous cases that hold prosecutors generally are entitled to absolute immunity for quasi-judicial activities. The opinion recognized that:
 
 
 96
 The vast majority of cases cited (by the government) involve claims arising from prosecutorial acts which unquestionably qualify for immunity under Imbler, e. g., the decision to initiate a criminal prosecution or the orchestration of an ensuing criminal trial, 186 U.S.App.D.C. at 191, 569 F.2d at 22 (footnote omitted).
 
 
 97
 3 Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).
 
 
 98
 Nine months after our decision in Briggs the Supreme Court issued its opinion in Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). This lawsuit sought damages from officials of the Department of Agriculture following an unsuccessful proceeding brought by the Department to revoke or suspend the registration of a commodity futures commission company. Following the failure of the agency's disciplinary proceeding Economou filed an action for damages alleging violations of various constitutional rights. The defendants included the Secretary of Agriculture, the Assistant Secretary, the Judicial Officer, the Chief Hearing Examiner and the Department attorney who prosecuted the proceeding.
 
 
 99
 The District Court held that the officials were entitled to absolute immunity and on that ground dismissed the action. However, the Court of Appeals reversed, holding that the officials were only entitled to qualified immunity, a determination reversed by the Supreme Court.
 
 
 100
 The majority opinion, by Justice White, discussed several questions reserved by the Court in Imbler and stated that while qualified immunity from liability for damages should be the general rule with respect to those in the executive department, there were some officials whose special functions require the full exemption from liability afforded by absolute immunity. In applying this premise, the Court held that persons who perform adjudicatory functions within agencies, where safeguards in administrative procedures tend to assure correctness of adjudications, are entitled to absolute immunity from liability for damages for their judicial acts.
 
 
 101
 The Court also decided that agency officials who perform functions analogous to those of a prosecutor are entitled to absolute immunity to assure that prosecutorial decisions with respect to agency proceedings will be made free from intimidation or harassment. This absolute immunity was also held applicable to the acts of agency attorneys in arranging and presenting evidence in an agency proceeding. The remarks of the Court in Butz as to these particular functions are particularly pertinent here because both cases involved the acts of individuals acting for the government in disciplinary proceedings. The Court stated:
 
 
 102
 If a civil action could be maintained against a judge by virtue of an allegation of malice, judges would lose "that independence without which no judiciary (can) either be respectable or useful." . . . Thus, judges were held to be immune from civil suit "for malice or corruption in their action whilst exercising their judicial functions within the general scope of their jurisdiction." . . . 36
 
 
 103
 438 U.S. at 509, 98 S.Ct. at 2912.
 
 
 104
 The principle of Bradley (v. Fisher, 13 Wall. 335, 20 L.Ed. 646 (1872)) was extended to federal prosecutors through the summary affirmance in Yaselli v. Goff, 275 U.S. 503 (48 S.Ct. 155, 72 L.Ed. 395) (1927), aff'g (mem), 12 F.2d 396 (CA2 1926). The Court of Appeals in that case discussed in detail the common-law precedents extending absolute immunity to parties participating in the judicial process: judges, grand jurors, petit jurors, advocates, and witnesses. Grand jurors had received absolute immunity " 'lest they should be biased with the fear of being harassed by a vicious suit for acting according to their consciences (the danger of which might easily be insinuated where powerful men are warmly engaged in a cause and thoroughly prepossessed of the justice of the side which they espouse).' " Id. (12 F.2d), at 403, quoting 1 W. Hawkins, Pleas of the Crown 349 (6th ed. 1787). The court then reasoned that " '(t)he public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.' " (Id.), 12 F.2d, at 404, quoting Smith v. Parman, 101 Kan. 115 (116), 165 P. 663 (1917). The court held the prosecutor in that case immune from suit for malicious prosecution and this Court, citing Bradley v. Fisher, supra, affirmed.
 
 
 105
 We recently reaffirmed the holding of Yaselli v. Goff in Imbler v. Pachtman (424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)), supra, a suit against a state prosecutor under § 1983. The Court's examination of the leading precedents led to the conclusion that "(t)he common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties." (Id.), 424 U.S., at 422-423 (96 S.Ct., at 991). The prosecutor's role in the criminal justice system was likely to provoke "with some frequency" retaliatory suits by angry defendants. Id., at 425 (96 S.Ct., at 992). A qualified immunity might have an adverse effect on the functioning of the criminal justice system, not only by discouraging the initiation of prosecutions, see id., at 426 n. 24 (96 S.Ct., at 993), but also by affecting the prosecutor's conduct of the trial:"Attaining the system's goal of accurately determining guilt or innocence requires that both the prosecution and the defense have wide discretion in the conduct of the trial and the presentation of evidence. . . . If prosecutors were hampered in exercising their judgment as to the use of . . . witnesses by concern about resulting personal liability, the triers of fact in criminal cases would often be denied relevant evidence." Id., at 426 (96 S.Ct., at 993).
 
 
 106
 In light of these and other practical considerations, the Court held that the defendant in that case was entitled to absolute immunity with respect to his activities as an advocate, "activities (which) were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force." Id., at 430 (96 S.Ct., at 995.) 37
 
 
 107
 438 U.S. at 509-511, 98 S.Ct. at 2912-2913.
 
 
 108
 We think that the Court of Appeals placed undue emphasis on the fact that the officials sued here are from an administrative perspective employees of the Executive Branch. . . . Absolute immunity is . . . necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.
 
 
 109
 We think that adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages.
 
 
 110
 438 U.S. at 511-513, 98 S.Ct. at 2913-14. (emphasis added) And in my view the court's Unauthorized Practice of Law Committee in passing initially on complaints against lawyers was acting more judicially than federal administrative agencies in their adjudications.
 
 
 111
 There can be little doubt that the role of the modern federal hearing examiner or administrative law judge within this framework is "functionally comparable" to that of a judge. His powers are often, if not generally, comparable to those of a trial judge: he may issue subpoenas ([19], rule on proffers of evidence, regulate the course of the hearing, and make or recommend decisions. See § 556(c). More importantly, the process of agency adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency.
 
 
 112
 438 U.S. at 513, 98 S.Ct. at 2914.
 
 
 113
 In light of these safeguards, we think that the risk of an unconstitutional act by one presiding at an agency hearing is clearly outweighed by the importance of preserving the independent judgment of these men and women. We therefore hold that persons subject to these restraints and performing adjudicatory functions within a federal agency are entitled to absolute immunity from damages liability for their judicial acts. Those who complain of error in such proceedings must seek agency or judicial review.
 
 
 114
 438 U.S. at 514, 98 S.Ct. at 2915.
 
 
 115
 We also believe that agency officials performing certain functions analogous to those of a prosecutor should be able to claim absolute immunity with respect to such acts. . . . Because the legal remedies already available to the defendant in such a proceeding provide sufficient checks on agency zeal, we hold that those officials who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication are entitled to absolute immunity from damages liability for their parts in that decision.
 
 
 116
 438 U.S. at 515-516, 98 S.Ct. at 2916 (emphasis added). The statement in italics has particular application here.
 
 
 117
 We turn finally to the role of an agency attorney in conducting a trial and presenting evidence on the record to the trier of fact. We can see no substantial difference between the function of the agency attorney in presenting evidence in an agency hearing and the function of the prosecutor who brings evidence before a court. 40 . . . We therefore hold that an agency attorney who arranges for the presentation of evidence on the record in the course of an adjudication is absolutely immune from suits based on the introduction of such evidence.
 
 
 118
 438 U.S. at 516-517, 98 S.Ct. at 2916 (emphasis added).
 
 
 119
 The upshot of the Supreme Court's decision in Butz v. Economou was to remand the case to the Court of Appeals and the District Court to apply the principles enunciated in its opinion. On remand, as Judge Richey's opinion notes at page 28, the only individuals in the Department of Agriculture who were held not to be entitled to absolute immunity were two auditors for whom absolute immunity was never claimed. Butz v. Economou, 466 F.Supp. 1351, 1360 (S.D.N.Y.1979).
 
 
 120
 It is apparent that Butz decided some of the immunity issues with respect to prosecutors and other participants in enforcement proceedings that were left open in Imbler. It is also apparent that the members of the Court appointed Committee on the Unauthorized Practice of Law were clearly exercising delegated judicial authority when they were required to determine whether probable cause had been shown that the Simonses by their telephone listing and stationery, were holding themselves out as practicing law in the District of Columbia in violation of the Court's Rules. Accordingly, reasoning a fortiori from Butz and because this case is distinguishable from Briggs,[20] I concur in the conclusion that the members of the Court's Committee are entitled to absolute immunity.
 
 
 121
 Our opinion in Briggs issued on September 21, 1977 and the Supreme Court issued its opinion in Butz v. Economou, supra, nine months later on June 29, 1978. Butz is thus controlling as the latest decision on the subject and its facts are closer to the Simonses' case than were the facts in Briggs. Both Butz and Simons involved attempts by supervisory boards to discipline persons who were subject to their jurisdiction although in both instances no person was disciplined, yet damage suits were subsequently brought against those members of the government who participated in the aborted proceedings. In Butz the board and others active in the disciplinary proceeding were found to be exercising a quasi-judicial function and entitled to absolute immunity even though they were all members of and appointed by, the executive branch of government. In Simons all persons involved were appointed by the judiciary and they were performing inherently judicial functions that had been specifically delegated to them by the court. They were also compensated by the court for their services and expenses. Butz v. Economou holds that federal executive officials only have qualified immunity except where they show a special need for a full exemption from liability. In that case the special showing that was deemed sufficient to justify absolute immunity for the involved officials is more than duplicated by the Committee members here, even if we were to treat them as prosecutors. In addition, the Committee members here were performing a judicial function of the utmost importance as duly appointed officers of the Court to serve for regular terms.
 
 
 122
 If the members of the executive branch who participated in the disciplinary proceeding in Butz were entitled to absolute immunity, here the court appointed committee members carrying out an inherent judicial responsibility were even more entitled to absolute immunity. The Committee's action here is more distinctly judicial than that involved in Kissell v. Breskow, 579 F.2d 425 (7th Cir. 1978) where the Executive Secretary of the Disciplinary Commission of Indiana (a state agency consisting of members appointed by the Indiana Supreme Court) was held entitled to quasi-judicial immunity in referring a grievance involving an attorney to the Disciplinary Commission of the state Bar in alleged violation of constitutional rights of one of his clients.
 
 
 123
 In reaching the above conclusion it is unnecessary to go to any length to distinguish Simons from Briggs. The two cases distinguish themselves by the nature of the official behavior that was subject of the appellants' complaints. In Briggs the claim was made that the prosecutor exceeded his authority by committing a criminal offense when testifying as a witness in connection with a grand jury investigation that he was conducting. The court held such conduct to be investigative, not advocatory, and so entitled only to qualified immunity. In Simons we find that the Committee was merely making the judicial determination as to whether probable cause was shown to support a complaint from the Bar Association that the Simonses were in violation of the Court's Rules on practicing law. The Committee decided that the Simonses' conduct did not justify further proceedings. It is thus not necessary to further consider the investigatory/advocatory dichotomy. With respect to Briggs it should also be stated, as Judge McGowan's opinion recognizes, that such case represented an exception from the "incontestable" general rules that "prosecutors enjoy absolute immunity for acts done in the performance of their official functions (which generally involve) the decision to initiate a criminal prosecution or the orchestration of an ensuing criminal trial." 186 U.S.App.D.C. at 191, 569 F.2d at 22. Thus, if the Committee members were likened to prosecutors the nature of the function they performed would still qualify them for absolute immunity.
 
 
 124
 My conclusion is also supported by a long line of cases which apply the rule of absolute immunity for quasi-judicial activity to a number of situations involving noncourt personnel who were acting more remotely from direct judicial authority than the Committee members here. Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (legislators); Butz v. Economou, supra, (Agriculture Department Officials); Bershad v. Wood, 290 F.2d 714 (9th Cir. 1961) (Internal Revenue Service Agents); Bauers v. Heisel, 361 F.2d 581 (3rd Cir. 1966) (en banc) cert. denied, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967) (Prosecutor for indictments obtained against minor); Brown v. Dunne, 409 F.2d 341, 343 (7th Cir. 1969 (Court clerk); Dieu v. Norton, 411 F.2d 761, 763 (7th Cir. 1969) (Court clerk and court reporter); Burkes v. Callion, 433 F.2d 318, 319 (9th Cir. 1970) cert. denied 403 U.S. 908, 91 S.Ct. 2217, 29 L.Ed.2d 685 (1971) (Probation officer and court-appointed psychiatrist in submitting reports); Pope v. Chew, 521 F.2d 400, 405 (4th Cir. 1975) (Probation officer in submitting parole and pardon recommendations); Johnson v. Reagan, 524 F.2d 1123, 1124 (9th Cir. 1975) (legislators); Hoke v. Board of Medical Examiners of State of North Carolina, 445 F.Supp. 1313 (W.D.N.C. 1978) (Medical examination board); Woolridge v. Virginia, 453 F.Supp. 1333 (E.D.Va.1978) (Welfare Commissioner preparing adoption recommendation at court's direction).[21]
 
 
 125
 A judge is absolutely immune for all acts performed within his jurisdiction, even from actions under the civil rights laws. Stump v. Sparkman, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978).
 
 
 126
 A distinction between judges of superior and inferior courts is made but only on the basis of the extent to which a judge may stray from his jurisdiction and still be protected by absolute immunity. A judge of a court of superior or general jurisdiction is not liable for any acts so long as he has not acted in clear absence of all jurisdiction. Id. at 355-57, 98 S.Ct. 1099. A judge of a court of inferior of limited jurisdiction enjoys absolute immunity so long as acts are taken within his jurisdiction. Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 351, 20 L.Ed. 646 (1872), McClain v. Brown, 587 F.2d 389, 390 (8th Cir. 1978).
 
 
 127
 Judicial action extends beyond those activities which are at the core of the judicial process, such as trying cases or deciding appeals; a judicial acts is one which "may normally be corrected on appeal." Gregory v. Thompson, 500 F.2d 59, 64 (9th Cir. 1974). Since judicial immunity extends to state Supreme Court Justices in actions arising out of disbarment proceedings, Gately v. Sutton, 310 F.2d 107, 149 (10th Cir. 1962), should court-appointed Committee members acting within the parameters of their assignment be accorded only a qualified immunity standard?
 
 
 128
 An immunity claim is evaluated not on the title of the officer but on whether the conduct complained of involves the "performance of a judicial or quasi-judicial function." Hoke v. Board of Medical Examiners of State of N. C., 445 F.Supp. 1313, 1314 (W.D.N.C.1978). The immunity afforded the Committee must be assessed on the basis of the Committee's function. That analysis causes me to conclude that absolute immunity is the appropriate standard to be applied here and that, as a result, the district court properly granted summary judgment for the defendants. Accordingly, I join in the judgment affirming the District Court.
 
 WILKEY, Circuit Judge, dissenting:
 
 129
 This appeal raises the question whether members of the District of Columbia Court of Appeals Committee on Unauthorized Practice of Law are entitled to absolute or qualified immunity in a suit alleging deprivation of constitutional rights in the course of an investigation. The district court did not specifically address this issue, but entered an order granting summary judgment to appellee members of the Committee, concluding that "this Court is satisfied that the actions of Defendants in investigating Plaintiffs' practice of law were reasonable and within their lawful authority." Although I agree that the Committee's actions were within the scope of its lawful authority, I believe that qualified immunity is the appropriate standard here, and that summary judgment on that basis was not warranted by the record. Therefore I would reverse and remand for further proceedings consistent with a qualified immunity standard.
 
 I. BACKGROUND
 A. The Relevant Statute and Rules
 
 130
 The District of Columbia Court of Appeals is authorized by statute to "make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and expulsion."[1] The Committee on Unauthorized Practice of Law, "consisting of six members of the Bar of (that) Court," was accordingly established by Rule 46 II (a) of the District of Columbia Court of Appeals. The members are appointed by the court of appeals, serve staggered three-year terms, and are to receive "such compensation and necessary expenses as the Court may approve."[2] The Committee is empowered, "(s)ubject to the approval of the Court (to) adopt such rules and regulations as it deems necessary to carry out the provisions of this rule."[3]
 
 
 131
 The Committee is to enforce Rule 46 II (b):
 
 
 132
 (1) No person shall regularly engage in the practice of law in the District of Columbia or in any manner hold himself out as authorized or qualified to practice law in the District of Columbia unless he is an enrolled active member of the Bar.
 
 
 133
 Rule 46 II (b)(6)-(7) excepts from this general prohibition persons practicing before courts and agencies of the United States in the District of Columbia to the extent authorized by those bodies.[4]
 
 
 134
 Further, the Committee may commence proceedings seeking contempt penalties and/or injunctive relief for violations of this rule. The proceedings are to be held before a judge designated by the chief judge and are "subject to review in the usual appellate practice."[5]
 
 
 135
 The duties of the Committee are made clearer in its own rules. Committee Rule A deals with investigations. It provides that in the course of an inquiry, the testimony of any witness the Committee deems relevant may be taken. "Such testimony may be taken under oath. Any transcript of the testimony shall be for the use of the Committee." Witnesses are allowed to have counsel present at the inquiries. In addition, "(a)ttendance of witnesses may be compelled by subpoena upon application therefor to the Chief Judge . . . ."[6]
 
 
 136
 Another Committee rule lists four types of action that may be taken by the Committee. They are: "(1) to close an inquiry without further action, (2) to accept voluntary compliance from the person or persons concerned, (3) to issue a formal opinion, and/or (4) to petition the Court for a Rule to Show Cause in accordance with Rule 46 II b . . . ."[7]
 
 
 137
 It is the Committee's conduct prior to and during an investigation apparently authorized by Committee Rule A that gives rise to this action.
 
 B. The Factual Setting
 
 138
 Appellants Morton L. Simons and Barbara M. Simons are admitted to practice before the courts of New York State, the Supreme Court of the United States, the United States Courts of Appeals for the District of Columbia, Third, Fifth, and Tenth Circuits, as well as various federal regulatory agencies. They have maintained offices in the District of Columbia since 1962 to facilitate their practice before those federal courts and agencies, although they are not admitted to the Bar of the District of Columbia Court of Appeals.
 
 
 139
 Appellees, the Chairman and members of the Committee on Unauthorized Practice of Law, are attorneys and members of the District of Columbia Bar. In April 1974 the Chairman wrote to Mr. Simons informing him that Simons' listing in the local yellow pages conveyed the impression that he was holding himself out as authorized to practice in the District. The letter requested "prompt written advice as to whether or not you are a registered member of the District of Columbia Bar, and if so, your status, Bar number, and date of admission to the Bar."
 
 
 140
 Responding, Simons informed the Chairman that he was admitted to practice in New York and before various federal courts and agencies, but "not admitted to practice before the local courts of the District of Columbia." He wrote, "I certainly do not regard the telephone listing as a representation that I practice or intend to practice in the local court system. Rather the listing is intended as a convenience to other federal agency practitioners in locating my phone number, just as I find it a convenience to use the listings to locate theirs."
 
 The Chairman's reply contended that
 
 141
 if one engages in law practice in the District of Columbia or holds himself out as authorized to practice law in the District of Columbia he must be a member of the District of Columbia Bar. Law practice, of course, includes law practice involving federal agencies and Appellate Courts. It is not limited merely to appearances before the local courts or general practice involving local law.
 
 
 142
 Furthermore, it should be noted that in both the telephone book and your stationery you refer to yourself as a lawyer with no indication that you are not admitted in the District of Columbia. Both constitute means of holding out the right to practice in this jurisdiction.
 
 
 143
 Accordingly, you should take steps to become properly admitted to practice in this jurisdiction or cease any holding out as an attorney in the District of Columbia or the maintenance of a law office in the District of Columbia.
 
 
 144
 The letter then requested further advice of Simons' plans of compliance with the rule.
 
 
 145
 In subsequent letters and a meeting with the Chairman, the Simonses argued that the local rule did not apply to their federal practice, based on the language of the rule and the Supreme Court opinion issued in Sperry v. Florida.[8] They did, however, express a willingness "to carry a notation on (their) letterhead (and in the telephone book also, if feasible) indicating that (their) practice (was) exclusively before the federal courts and agencies."
 
 
 146
 The Chairman then instituted a proceeding to "develop pertinent facts relating to the question of whether (the Simonses) were or were not" in violation of Rule 46 II. A subpoena issued commanding the presence of Mr. Simons at a hearing of the Committee scheduled for 18 June 1975; the hearing was later rescheduled for 9 July 1975. Simons did not appear personally there, but was represented by counsel. Counsel requested a statement of (1) the matters considered to be in issue, and (2) the procedures to be followed by the Committee in the case. She said if both the requests were granted, Simons would appear voluntarily.
 
 C. The Course of These Proceedings
 
 147
 This action was filed on 18 July 1975, shortly after the meeting between Simons' counsel and the Committee. The complaint sought declaratory and injunctive relief as well as damages and attorneys' fees. When the Simonses sought to initiate discovery, the Committee moved for a protective order. During the course of oral argument on the motion in October 1975, the district court dismissed the complaint on the grounds of lack of subject-matter jurisdiction and prematurity.
 
 
 148
 Simons appealed, and on 28 September 1976 this court[9] reversed and remanded. The court ordered:
 
 
 149
 (T)he judgment of the District Court appealed from in this cause is hereby reversed, and this case is remanded to the District Court with instructions to defer further action for a reasonable period of time to afford appellants an opportunity to obtain a definitive ruling as to whether their activities violate the rules of the District of Columbia Court of Appeals governing the practice of law, and to allow the unauthorized practice of law proceedings to be concluded. Thereafter the District Court will expeditiously proceed to decide the issues presented in the complaint before it unless they have been otherwise disposed of.[10]
 
 
 150
 After remand, the Simonses again sought to commence discovery, but the trial court granted the Committee members' motion for a protective order on 14 December 1976. In the meantime, the Committee conducted a proceeding to determine whether the Simonses were in violation of Rule 46 II. At the conclusion of the proceeding, the Committee by letter advised Mr. Simons that it had "closed its file." The Committee decided that "while your letterhead and telephone listing constitute a technical violation of Rule 46 II, in view of all the surrounding circumstances, there has been no prejudice to the public and therefore no occasion for the Committee to take further action."[11]
 
 
 151
 Once more the Simonses attempted to undertake discovery. The Committee members moved for a protective order, and shortly thereafter moved for summary judgment. The district court granted the members' motion for summary judgment, arriving at the following conclusions:
 
 
 152
 While the Court agrees that it has subject matter jurisdiction in this suit, this Court is not persuaded by Plaintiffs' other arguments. With respect to the declaratory judgment and injunction aspects of this action, the Court finds such to have been mooted by the outcome of the proceedings before the Bar Committee in May, 1977. With respect to the issue of damages, and after examination of the record, this Court is satisfied that the actions of Defendants in investigating Plaintiffs' practice of law were reasonable and within their lawful authority.
 
 
 153
 Accordingly, summary judgment for Defendants is in order.[12]
 
 
 154
 The Simonses filed this appeal, and both sides moved for summary disposition of the appeal. On 3 March 1978 this court[13] summarily affirmed the dismissal for mootness of the injunctive and declaratory portions of the suit, but denied the motions for summary action as to the dismissal of the damages portion of the suit.
 
 II. THE APPROPRIATENESS OF SUMMARY JUDGMENT
 
 155
 At the outset it is important to note that we all agree that the district court correctly held that the actions of the Committee were within the outer perimeter of its lawful authority. We are also agreed that if qualified immunity is the appropriate standard, the district court erred in granting summary judgment on this record. Because I think that the Chairman and members of the Committee are entitled only to qualified immunity against the claims of constitutional deprivations here, I would reverse and remand.
 
 A. Scope of Authority
 
 156
 A public official is entitled to immunity from suit so long as the act causing injury is not "manifestly or palpably beyond his authority," but rather has "more or less connection with the general matters committed by law to his control or supervision."[14] Here I cannot say the Committee's actions were beyond the "outer perimeter"[15] of its authority.
 
 
 157
 The Simonses contend that the Committee's actions were outside the scope of its authority because it was attempting to interfere with their exclusively federal license in contravention of Sperry v. Florida[16] and the wording of Rule 46 II.[17] However, to prove that an act is outside an official's scope of authority, it is not sufficient to show that it was illegal. As this court recently said in Briggs v. Goodwin, "the difficulty with this approach is that any allegation that an official, acting under color of law, has deprived someone of his rights necessarily implies that, in the particular case, the official exceeded his authority. Such logic would completely abrogate the doctrine of immunity."[18] The Committee clearly had authority to investigate and take action when there was a possibility that unadmitted persons were practicing law or holding themselves out as authorized to practice in the District of Columbia. The Committee's conduct scrutinized by this suit is precisely of that nature. That the Committee may have erred in its interpretation of the applicable rule and constitutional provision during its investigation and attempts to secure voluntary compliance does not remove the act from its scope of authority.
 
 
 158
 I then agree with the court's affirmance of the finding of the district court that the Committee's actions were within the scope of its lawful authority for purposes of immunity doctrine. The principal remaining issue is whether the Chairman and members of the Committee are entitled to absolute, qualified, or no immunity.
 
 
 159
 B. Qualified Immunity is the Appropriate Standard
 
 
 160
 The trial court applied no visible standard in finding that the Chairman and members of the Committee were immune from this action. By finding that "the actions of (appellees) in investigating (appellants') practice of law were reasonable and within their lawful authority,"[19] the judge may have determined sub silentio that qualified immunity was appropriate, or may have thought in terms of absolute immunity, or immunity, period. If the trial judge thought in terms of absolute immunity or immunity without qualification, I believe he erred; if he meant qualified immunity, I would still reverse and remand because summary judgment based on qualified immunity was not possible on this record.
 
 
 161
 1. The Chairman and Members of the Committee Are Entitled to Some Degree of Immunity
 
 
 162
 Because the Committee was created and its members appointed by the District of Columbia Court of Appeals to assist in the elimination of unauthorized practice of law in the District, I believe that they are persons performing a public function entitled to some degree of immunity.
 
 
 163
 Appellants argue that the Chairman and members of the Committee are entitled to no immunity at all. After observing that "the precise nature of defendants' status is one of the facts in dispute," appellants proffer two principal reasons why immunity should be inappropriate. The first reason for denying Committee members immunity is that they are "lawyers in private practice," not "judges, nor prosecutors, nor grand jurors."[20] Appellants also point out that the inquiries were carried out in private offices, and not in a courtroom.[21] The second reason to withhold immunity is that the Committee's function "is simply not a judicial function . . . . (P)revention of the unauthorized practice of law is no more a judicial function than prevention of the unauthorized practice of medicine is a medical function."[22] They contend that "(r)estraining the unauthorized practice of any profession . . . is one of the police powers,"[23] and that the Committee's functions "are essentially those of a licensing board."[24]
 
 
 164
 Appellants' first argument should be rejected immediately. Any immunity that the Committee members may have by virtue of their public office is not dissipated because they are also private practitioners. "The crucial inquiry concerns the nature of the official behavior challenged, not the identity or title of officers responsible therefor."[25] The behavior here challenged was that of appellees in the role of Committee members, not in their role of private practitioners.
 
 
 165
 It is granted that appellees are not grand jurors, judges, or prosecutors, but this does not mean that they are not participating in a judicial function.[26] Opinions from several other circuits recognize that bar organizations are entitled to quasi-judicial immunity in matters concerning admission of attorneys or the taking of adverse action against them.[27] While in my view these cases do not compel us to apply absolute immunity to the Committee's activities, they are persuasive authority for granting some degree of immunity.
 
 
 166
 Certainly the bar licensing function is not merely "tacked on" to the court's judicial function; rather, the determination of who appears before it is inherent in the judicial power.[28] The Committee's work may not be as crucial to the functioning of the judicial system as that of a judge, jury, prosecutor, defense lawyer, or witness,[29] but that does not mean it is without importance. The statute authorizing the court of appeals to issue rules and regulations on the licensing of attorneys[30] evidences an important public interest in assuring that parties in the judicial system be represented by those meeting minimal standards of competency and morality. I believe that "(d)enying any measure of immunity in these circumstances 'would contribute not to principled and fearless decision-making but to intimidation' "[31] of these officials in the performance of important public functions.
 
 
 167
 Thus, I believe that the work of these Committee members is sufficiently related to the judicial process to warrant some degree of immunity.
 
 
 168
 2. The Committee Was Engaged in Investigative Conduct, Warranting Only Qualified Immunity
 
 
 169
 On the authority of Briggs v. Goodwin[32] I would hold that the Committee was principally engaged in investigatory, rather than advocatory activity, and therefore its members are protected only by qualified immunity against the allegations of constitutional deprivations.[33]
 
 
 170
 Appellees refer us to the several opinions in other circuits that recognize a quasi-judicial immunity for bar organizations in regulating the admission and discipline of attorneys[34] as authority for applying absolute immunity here. It is argued that the Committee should be granted absolute immunity for its similar activities. The argument may be strengthened if one compares the Committee's duties to those of a prosecutor.[35] Butz v. Economou[36] held that those administrators "performing certain functions analogous to those of a prosecutor" should be immune for "any decision to initiate or continue a proceeding subject to agency adjudication."[37]
 
 
 171
 On the other hand, in Dacey v. New York County Lawyers Association[38] the Second Circuit held that the bar association was not entitled to immunity with respect to its institution of contempt proceedings against the author of How to Avoid Probate! for the unauthorized practice of law. The court found that the author's first amendment rights outweighed any immunity interest possessed by the association in that situation. However, the court affirmed the district court's dismissal of the case because the association had "probable cause" to initiate proceedings against the author. This seems tantamount to a holding that when first amendment rights are impinged, such bar entities are entitled to only qualified immunity for their enforcement activities,[39] and that good faith (i.e., probable cause) was a valid defense in Dacey.
 
 
 172
 I am not sure that this type of entity is ever protected by absolute immunity. Assuming arguendo that the Committee could be entitled to absolute immunity for decisions to initiate or continue proceedings, I think that the investigative/advocatory dichotomy developed in Briggs v. Goodwin mandates application of qualified immunity here.
 
 
 173
 In Briggs it was alleged that a special U.S. attorney conducting a grand jury proceeding had perjured himself in responding to a judge's query if any of the subpoenaed members of an anti-war organization were government informers. The purported perjury took place in open court, the defendant attorney having been sworn to testify. In affirming the district court's refusal to dismiss the section 1983 action subsequently brought against the U.S. attorney on the basis of absolute immunity, this court held:
 
 
 174
 When a prosecutor is engaged in essentially investigative as opposed to advocatory activities, the considerations of public policy which necessitated a grant of absolute immunity in Imbler no longer control. Regardless of his official status, a prosecutor functioning primarily as an investigator should be accorded only the qualified immunity typically conferred on other investigative officers. The crucial inquiry concerns the nature of the official behavior challenged, not the identity or title of the officer responsible therefor.[40]
 
 
 175
 The court then found that the attorney's "statement to the federal district court in Florida is properly characterized as an act of investigation rather than advocacy.[41]
 
 
 176
 Of course some investigative conduct is so intimately connected with a prosecutor's advocacy role that it is protected by absolute immunity.[42] This immunity "extends only so far as necessary to protect a prosecutor's decision with respect to the initiation and conduct of particular cases."[43]
 
 
 177
 If a prosecuting attorney's making a sworn statement to a presiding judge during a grand jury proceeding is investigative, then the conduct here is a fortiori investigative rather than advocatory behavior. Goodwin was appearing in open court as lead counsel for the United States in a criminal proceeding, certainly on the surface an advocate's role, and only stepped aside momentarily to answer one question as a witness ; both counsel and witness normally enjoy absolute immunity while appearing in court. No role as advocate (or witness) is ascribed to appellees here. The allegedly injurious act in Briggs took place during a grand jury proceeding, an integral part of the prosecutorial process; no contempt proceeding had been brought at the time of the Committee's acts complained of here. The prosecutor's purported perjury in Briggs took place in open court, the Committee's activities were conducted outside of court.[44] In short, I am persuaded that the Committee's actions here were further removed from the advocacy role than the act complained of in Briggs, and must be classified as essentially investigative.
 
 
 178
 The majority is of the view that this appeal may be distinguished from Briggs because here the investigative activity of the Committee had "focused upon both a set of defendants and a specific wrong." They submit that because the Committee had already ascertained that the Simonses were holding themselves out as attorneys despite their lack of membership in the local bar, "(a) prima facie case had been established and the Committee was trying to determine whether the apparent violation was genuine and, if so, whether it warranted a formal proceeding." My colleagues suggest that Briggs "clear(ly)" holds "that prosecutorial activity is absolutely immune when it becomes focused upon a 'particular criminal proceeding.' " Because the investigation dealt with particular individuals and particular wrongs, the majority would apply absolute immunity.[45]
 
 
 179
 I cannot agree with this reading of Briggs. The language relied upon by the majority states:
 
 
 180
 Although . . . a prosecutor's advocacy function does extend beyond the confines of the trial courtroom, the examples of such preliminary advocate activities provided by the Supreme Court are instructive for their common focus on a particular criminal proceeding. By the plain import of the Court's remarks, absolute immunity under Imbler extends only so far as necessary to protect a prosecutor's decision with respect to the initiation and conduct of particular cases. Imbler does not, in our reading, immunize prosecutors for any and all measures they may undertake in the course of wide-ranging law enforcement investigations or general fact-finding expeditions.[46]
 
 
 181
 I read this language as holding that a prosecutor's activity must relate to a particular criminal proceeding to be protected by absolute immunity; I do not read it as declaring that all dealings by prosecutors with particular cases are shielded by absolute immunity.[47] For absolute immunity to apply, Briggs holds that the questioned conduct must be intimately connected with "the initiation and conduct of particular cases." Thus, I believe that particularity is but one of a number of factors to be considered and it is not wholly determinative of whether an activity is deemed investigative or advocatory.[48]
 
 
 182
 In any event, I am not so certain that this investigation was more particularized than that in Briggs. The Chairman's original letter to Simons implies that the Committee was also investigating others who appeared to be holding themselves out as authorized to practice in the District of Columbia.[49] The facts are not clear as to precisely how many others the Committee was investigating, but it could well be that this was the same sort of "fishing expedition" or broad-scale investigation found in Briggs.
 
 
 183
 In arguing that the Committee's inquiry had narrowed to particular individuals and a particular wrong, the majority seems to place heavy reliance on the "prima facie" case established by the Committee members "(f)rom their first contact with the Simons."[50] I am not so sure that such a case had been established. Although the Simonses were not members of the D.C. bar, they were admitted to practice before federal bodies in Washington, and by the local rules and Sperry v. Florida arguably were entitled to maintain an office in the District of Columbia without belonging to the local bar.[51] The Committee was made aware of these circumstances near the beginning of the investigation. The propriety of continuing the investigation in light of these facts may have been highly questionable.
 
 
 184
 In any event, I think the "prima facie" case argument is more relevant to good faith issues than it is to determining the appropriate level of immunity.[52] I certainly do not believe that the possible existence of a prima facie case against the Simonses cloaks all subsequent investigative behavior by the Committee with absolute immunity.
 
 
 185
 Appellees attempt to distinguish Briggs by noting that the Committee here was "under the direct control and supervision of the District of Columbia Court of Appeals," and lacked the functional independence from the judicial branch that the prosecutor possesses.[53] Appellees submit that:As members of a Committee concerned with the unauthorized practice of law in the District of Columbia, appellees are under the direct supervision and control of the District of Columbia Court of Appeals. That Court alone has the power to impose sanctions upon attorneys following a determination that its own standards have been violated, and, in the process, has ample opportunity to review the conduct of the Committee. Moreover, attorneys subjected to the Committee's scrutiny are obviously not foreclosed from expressing their dissatisfaction to this judicial supervisory body when, in their legal judgment, an expression of dissatisfaction is in order.[54]
 
 
 186
 I cannot agree with the distinction. In Briggs the prosecutor was on the stand and in the courtroom. The judge asked the question. The prosecutor was engaged in a proceeding with the grand jury, the centuries-old arm of the court. Here, while there ultimately may have been judicial supervision at a trial had the Committee sought to impose criminal sanctions, there appears to have been no judicial control over the Committee's investigative activities.[55] I simply cannot accept the proposition that the Committee's actions far removed from the courtroom were more subject to judicial control than was the prosecutor on the stand in Briggs and working with the court's grand jury in the courtroom.
 
 
 187
 Appellees also argue that their dealings with the Simonses did not resemble "those normally conducted by police officers, (but) were judicially authorized tasks which involved the obtaining, reviewing, and evaluation of evidence." They maintain that "(t)hese dealings were certainly necessary in order to make a determination whether to institute a proceeding in the District of Columbia Court of Appeals under its Rule 46 II or as a lesser alternative, to resolve the matter without resort to such a proceeding."[56]
 
 
 188
 However, the fact that an investigation is made with a possibility of eventually filing or pressing charges does not bring the activity within the protection of absolute immunity. The conduct must be "intimately associated with the judicial phase"[57] to be protected by absolute immunity. I would find the requisite relationship absent here. Apparently the Committee as an entity did not begin to contemplate formal or informal action of any sort until it instituted its inquiry proceedings.[58] Even then, according to the Chairman's affidavit, the hearings were conducted to decide whether appellants "were or were not in violation of . . . Rule 46 II,"[59] apparently not with an immediate view of deciding to commence or not commence criminal contempt proceedings. I believe that the activities of Committee members prior to the inquiry and during the inquiry were not sufficiently proximate to a decision whether to institute proceedings to warrant absolute immunity, even assuming arguendo that such decisionmaking merits absolute immunity.
 
 
 189
 The majority opinion criticizes "appellants' simplistic assertion that the Committee members are identical to prosecutors." Although claiming to leave the issue undecided,[60] my colleagues seem to suggest that the Committee possesses a broader immunity than prosecutors. This is based on assertions that the Committee's function is more judge-like than that of prosecutors, its authority more limited, its work subject to closer judicial supervision, and its members more likely subjects for retaliatory lawsuits.[61] I cannot agree with the implication that the Committee's immunity is greater than a prosecutor's.
 
 
 190
 To my knowledge, no court has ever stated that such bar committees are entitled to a broader grant of immunity than prosecutors. I think it is unseemly to implicitly hold or suggest that individuals attempting to prevent unauthorized persons from practicing law are entitled to more immunity than officers attempting to protect society from general crime. The public might view this unfortunate implication as another attempt by the legal profession to maintain and tighten its monopoly on the provision of legal services.
 
 
 191
 I do not suggest that the relationship of the Committee to the District of Columbia Court of Appeals is irrelevant to the immunity question. It is because of this relationship that I believe the members are entitled to some degree of immunity. However, I am of the view that at most the members are protected by the immunity granted prosecutors.[62]
 
 
 192
 C. Summary Judgment Based on Qualified Immunity Here Improper
 
 
 193
 I realize that to avoid the danger of significantly dampening the zeal of public officials, the Supreme Court has indicated that "damage suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of (qualified) immunity."[63] Here, however, the affidavits were patently insufficient to support a motion for summary judgment based on qualified immunity. The Chairman's affidavit does not affirmatively assert that he had a good faith belief that appellants were in violation of Rule 46 II. There is nothing in the affidavits or the district court's opinion bearing on whether he "knew or reasonably should have known" his actions "would violate the constitutional rights" of appellants, nor whether "he took the action with malicious intention to cause a deprivation of (clearly established) constitutional rights or other injury" to them.[64] And even if appellees allege under oath these and other matters relevant to a good faith defense, all would be subject to contradiction by appellants, whose right to explore such factual issues at trial could not be cut short by summary judgment. I would hold that summary judgment on this record was improper.
 
 IV. CONCLUSION
 
 194
 I would reverse the order of the district court insofar as it granted summary judgment based on the immunity of the Chairman and members of the Committee. Therefore, I respectfully dissent.
 
 
 
 *
 Charles R. Richey, of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976)
 
 
 [1]
 District of Columbia Court Reform and Criminal Procedure Act of 1970, § 111, 84 Stat. 609 (codified at D.C. Code § 11-2501(a) (1973))
 
 
 [2]
 Compare D.C.Ct.App. Bar R. XI, § 4 (Board on Professional Responsibility) with D.C.Ct.App.R. 46 I (a) (Committee on Admissions) and D.C.Ct.App.R. 46 II (a) (Committee on Unauthorized Practice of Law)
 
 
 [3]
 Defendants have, to date, not put in issue the adequacy of any of the plaintiffs' claims under these constitutional provisions. Hence, the plaintiffs' right to sue under these constitutional provisions is not before the Court, and we make no ruling on the matter
 
 
 [4]
 Due to the dismissal of plaintiffs' claims for injunctive and declaratory relief, the Court is only presented with the issue of defendants' immunity from damage claims. See Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Fowler v. Alexander, 478 F.2d 694, 696 (4th Cir. 1973) (judicial immunity does not extend to prayers for injunctive relief)
 
 
 [5]
 Although in Dacey the Second Circuit found that the Association lacked immunity, it nonetheless dismissed the complaint after finding that the Association had "probable cause" in bringing suit. 423 F.2d at 195. We prefer not to follow the Second Circuit for three reasons. First, the court's decision to grant protection for prosecutions based on "probable cause" is, in reality, tantamount to a grant of qualified immunity. Second, the court's holding that although the Association acted as a prosecutor, it lacked immunity when initiating a lawsuit is plainly inconsistent with the rationale of Imbler v. Pachtman, 424 U.S. 409, 431, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976) ("We hold that in initiating a prosecution . . . the prosecutor is immune from a civil suit for damages . . .."). Finally, the Second Circuit relied upon "an important factor" not presented by this case: in Dacey, the Association was trying to suppress a book, not discipline someone giving "specific advice to specific individuals concerning their particular legal problems." 423 F.2d at 193 & n.9
 
 
 [6]
 Judge Wilkey's dissent, at page --- of 207 U.S.App.D.C., at page 800 of 643 F.2d, suggests that our conclusion that a prima facie case exists indirectly supports his finding that defendants are protected by qualified immunity. Contrary to his suggestion, however, our use of this term is unrelated to the issue of probable cause. Rather, the presence of a prima facie case indicates that the Committee's inquiry into the Simonses' practice had passed beyond the stage where mere police work was needed; once the matter had been presented to the Committee, it was called upon to exercise its prosecutorial discretion concerning the initiation of formal proceedings. The Committee was required not merely to evaluate the costs and benefits of a full-fledged prosecution, but also to interpret the rules of the District of Columbia Court of Appeals two matters reserved for prosecutors in their role as advocates. In this instance, the exercise of such discretion necessitated further inquiry and we hold that this particular inquiry is shielded by absolute immunity
 
 
 [7]
 See note 6 supra
 
 
 [8]
 J. H. Marshall & Assocs. v. Burleson, 313 A.2d 587, 591 (D.C.App.1973)
 
 
 [9]
 The district court also explained:
 As attorneys are officers of the court, the power to admit applicants to practice law is judicial and not legislative and is vested in the courts only. It is the duty of the court to exercise and regulate the admission of applicants to the bar by sound and just judicial discretion.
 Laughlin v. Clephane, 77 F.Supp. 103, 105 (D.D.C.1947).
 
 
 [10]
 This opinion need not, and does not, reach the issue of whether defendants' intimate relationship with the District of Columbia Court of Appeals may serve as a basis for granting Committee members a broader immunity than that afforded prosecutors. In other words, the Court makes no determination whether a prosecutor who engaged in conduct identical to defendants' would be shielded by absolute immunity. It holds only that under Butz v. Economou, 438 U.S. 478, 512, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Committee's relationship with the Court of Appeals is a legitimate factor to consider when determining the comparability of an official's judgments to those of a judge. To the extent that Judge Wilkey's dissent disagrees with this conclusion, see dissent at --- of 207 U.S.App.D.C., at 812 of 643 F.2d, we are unable to accept his assertion
 
 
 [11]
 The dissent disputes the adequacy of these checks upon the Committee's behavior. Dissent at --- - --- & n.55 of 207 U.S.App.D.C., at 811 n.55 of 643 F.2d. Yet, Butz v. Economou, 438 U.S. 478, 512, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), found absolute immunity where fewer constraints limited the behavior of the agency defendants. Moreover, we are unable to discern how the prosecutor in Briggs was subject to "safeguards built into the judicial process," 438 U.S. at 512, 98 S.Ct. at 2914, merely by taking the witness stand. In the adversarial system, the judge has little control over the veracity of a witness's testimony. Indeed, because a judge or jury must often resolve conflicting testimony, a fortiori some witnesses must be providing inaccurate testimony. Thus, it would appear that witnesses are generally afforded absolute immunity, not out of confidence in the legal system's ability to check their potential misconduct, but out of concern for their inability to protect themselves from inevitable harassment by disappointed litigants
 
 
 [12]
 In Briggs, the prosecutor was not only in the courtroom, but also on the witness stand at the time of the alleged wrong. Yet, this Court held that the presence of these familiar indicia of advocatory activity was not controlling. By the same turn, the outcome of this case may not be determined by a simple reference to the out-of-court locale of the Committee's inquiry. In fact, Imbler v. Pachtman, 424 U.S. 409, 431 n.33, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) expressly contemplated that some out-of-court prosecutorial activity could be shielded by absolute immunity
 
 
 [13]
 Because the "prosecutors" in this case also act as a grand jury, the maturity of their investigation is an especially critical factor. In the normal prosecutorial setting, the official would present his case to a grand jury and then, perhaps, receive an indictment to initiate the proceeding. Yet, here, the Committee must present the case to itself in order to determine whether to initiate suit. Without the guidance provided by the familiar advocatory setting of a grand jury, we must pay close attention to the maturity of the investigation in order to determine whether it had reached an equivalent of the protected grand jury phase
 
 
 [14]
 We do not accept Judge Wilkey's contention that Robichaud v. Ronan, 351 F.2d 533 (9th Cir. 1965) is inconsistent with our reading of Briggs. See dissent at n.47. Judge Wilkey views Robichaud as a situation in which the prosecution was still involved in investigative work, even though it had focused upon both a particular wrong and a particular defendant. Yet, the thrust of Miss Robichaud's complaint was that the prosecutor in fact had no idea who had committed the murder and that, nonetheless, he had singled her out for harassment. Because the prosecutor allegedly knew that he lacked a foundation for his assertion that Miss Robichaud was the perpetrator, his inquiry into her affairs plainly involved investigative police work. Accordingly, the Ninth Circuit found that the prosecutor was only entitled to qualified immunity. Thus, Robichaud, like Briggs, instructs lower courts to look beyond the formalities of the legal process and to examine instead the maturity of the prosecutor's inquiry
 
 
 [15]
 Judge Wilkey's dissent, at pages --- - --- of 207 U.S.App.D.C., at pages 807-809 of 643 F.2d, urges a different interpretation of Briggs as controlling in this matter. Evidently, the dissent interprets Briggs as consistent with instructing trial courts to weigh at least three factors when immunity is at issue: the setting of the prosecutor's conduct, whether he acts before or after the initiation of in-court proceedings, and finally, the particularity of his inquiry. Thus, Judge Wilkey concludes that "(i)f a prosecuting attorney's making a sworn statement to a presiding judge during a grand jury proceeding is investigative, rather than advocatory behavior, then the conduct here is a fortiori investigative." We disagree. While time and setting may be helpful indicia in determining the maturity of a prosecutor's inquiry, we read Briggs as holding that the focus on a particular criminal proceeding is the primary factor which trial courts must rely on in evaluating claims of immunity
 Judge Wilkey's dissent also concludes that the Committee's inquiry was "apparently not with an immediate view of deciding to commence or not commence criminal contempt proceedings." Dissent at --- of 207 U.S.App.D.C., at 811 of 643 F.2d. We find no support in the record for this assertion. To the contrary, the Simonses' complaint states, "Defendant Bellinger, with the support of the other defendants, . . . has explicitly threatened to initiate criminal contempt proceedings against plaintiffs . . .." Complaint P 7, C.A. No. 75-1164 (D.D.C. filed July 18, 1975). In addition, their original motion for a temporary restraining order alleged that they were about to suffer irreparable injury by "defendants' initiation and pursuit of criminal contempt proceedings." Memorandum in Support of Motion for a Temporary Restraining Order at 4 (filed July 18, 1975). Finally, on two occasions, defendants stipulated not to initiate formal proceedings until District Judge Robinson had been afforded an opportunity to review the Simonses' motions. Stipulation (filed July 24, 1975); id. (filed September 8, 1975).
 Finally, Judge Wilkey concludes that under our reading of Briggs "all dealings by prosecutors with particular cases are shielded by absolute immunity." Dissent at --- of 207 U.S.App.D.C., at 809 of 643 F.2d. We do not accept this characterization. Of course, as Briggs states, the prosecutor's conduct must also be related to the "initiation and conduct" of a particular case. See 186 U.S.App.D.C. at 189, 569 F.2d at 20.
 
 
 [16]
 Our holding regarding the requisite maturity of the prosecuting official's investigation is in accord with other recent decisions. For example, a city attorney who allegedly gave false testimony in order to obtain an arrest warrant was held to be performing "conduct within the prosecutorial function of his office." Front Runner Messenger Service, Inc. v. Ghini, 468 F.Supp. 305, 309 (N.D.Ill.1979). Also, officials in a state insurance department, who were authorized to represent the department in litigation, have been held entitled to absolute immunity for their activity during pre-trial discovery procedures. Safeguard Mut. Ins. Co. v. Miller, 456 F.Supp. 682, 692 (E.D.Pa.1978). In Daniels v. Kieser, 586 F.2d 64 (7th Cir. 1978), cert. denied, 441 U.S. 931, 99 S.Ct. 2050, 60 L.Ed.2d 659 (1979), the Seventh Circuit granted absolute immunity to a prosecutor who allegedly gave false testimony to obtain an arrest warrant against the plaintiff. In all of these cases, the officials had focused upon specific defendants and specific wrongs
 
 
 [17]
 This Court makes no ruling regarding the precise scope of the Committee's jurisdiction. We expressly decline to determine whether practitioners such as the Simonses commit any violation of the local rules or whether, if such a violation occurred, the local rules transgress the Supremacy Clause of the Constitution, art. VI, cl. 2, U.S.Const
 
 
 [1]
 This opinion follows Judge Richey's as I consider it to be supplemental to his opinion
 
 
 [2]
 This District of Columbia Court of Appeals is entirely separate from the United States Court of Appeals for the District of Columbia Circuit, commonly referred to as the United States Circuit Court. The District of Columbia Court of Appeals and the State Supreme Courts have relatively similar jurisdictions within their territories, while the United States Court of Appeals for the District of Columbia Circuit is the federal appellate Court of the Circuit and possesses all the jurisdiction of the ten other United States Circuit Courts of Appeal and in addition has some special federal jurisdiction as well as some jurisdiction in a few local District of Columbia matters
 
 
 [3]
 See pp. --- - --- of 207 U.S.App.D.C., pp. 794-797 of 643 F.2d, infra
 
 
 [4]
 Rule 46 II (a)
 
 
 [5]
 Rule 46 II (a) (2),
 
 
 [6]
 Appellant's Br. 17
 
 
 [7]
 Rule 46 II. UNAUTHORIZED PRACTICE OF LAW
 (a) Committee on Unauthorized Practice of Law.
 The Court shall appoint a standing committee known as the Committee on Unauthorized Practice of Law consisting of six members of the Bar of this Court. One-third of those first appointed shall serve for the term of one year, one-third for two years, and the remainder and all thereafter for the term of three years and until their successors have been appointed. In case of vacancy caused by death, resignation or otherwise, a successor appointed shall serve the unexpired term of his predecessor. When a member holds over after the expiration of the term for which he was appointed, the term he serves after the expiration of the term for which he was appointed shall be part of a new term. No member shall be appointed to serve longer than two consecutive regular three year terms.
 Subject to the approval of the Court, the Committee shall adopt such rules and regulations as it deems necessary to carry out the provisions of this rule. The members of the Committee shall receive such compensation and necessary expenses as the Court may approve.
 (b) Practice of Law in the District of Columbia.
 No individual shall regularly engage in the practice of law in the District of Columbia or in any manner hold himself out as authorized or qualified to practice law in the District of Columbia unless he is an enrolled active member of the Bar.
 (1) No person, firm, association, bank or corporation shall, in the District of Columbia, advise or counsel any person on matters affecting legal rights, or practice or appear as an attorney at law for a person other than himself in any court, or furnish an attorney or attorneys to render legal services; or hold himself out to the public as being entitled to practice; or in any other manner assume to be an attorney at law, or assume, or use or advertise the title of lawyer, attorney or counselor, or any equivalent title, in such manner as to convey the impression that he is entitled to practice law, or in any manner advertise that he either alone or together with any other persons or person maintains an office for the practice of law in the District of Columbia, without being a member of the Bar; provided that nothing contained herein shall prevent accountants and trust companies and banks with trust departments from performing such acts as may be authorized within the statements of principles between the American Bar Association and their respective professional groups as the same are set forth in the Martindale-Hubbell Law Directory; or prevent life insurance underwriters from performing such acts as may be authorized by the statements of principles between the Bar Association of the District of Columbia and the District of Columbia Life Underwriters Association, Inc., and The American Society of Chartered Life Underwriters; or prevent realtors from performing such acts as may be authorized by the statements of principles between the Bar Association of the District of Columbia and the Washington Board of Realtors, Inc., as published in the D.C. Bar Journal, page 16, Volume 35 # 8-10 (August-September-October, 1968); or prevent Title Insurance Companies from performing such acts as may be authorized by the Statement of Principles dated February 20, 1975 between the District of Columbia Bar and the Title Insurance Companies signatory thereto.
 (2) The practice of law as used in this rule shall include, but is not limited to, appearing for a person other than himself as attorney in any court, or preparing deeds, mortgages, contracts, assignments, discharges, leases, trust instruments or any other instruments affecting real or personal property or any interest therein, or wills, codicils, or any other instruments affecting the disposition of property or decedents' estate, or pleadings of any kind in any action brought before any court.
 (3) Nothing herein shall prohibit a person from appearing and participating in a particular action or proceeding in any court in the District of Columbia if special permission therefor has been granted by any such court.
 (4) Nothing herein shall prohibit any person employed by the United States or by any department, commission, or agency of the United States, whether as a lawyer or otherwise, from performing and carrying out the duties and functions of his office, except to the extent that such duties include practice before a court of the District of Columbia, in which case he shall either become a member of the Bar of such court or obtain special permission therefor.
 (5) Nothing herein shall prohibit any person from practicing before any court of the United States, or before any department, commission, or agency of the United States to the extent that such practice is authorized by any rule or order of such court or by any rule or regulation of any such department or agency. This rule shall not be construed to repeal, supersede or modify any law, rule or regulation which relates to practice before any court, department, commission or agency of the United States.
 (6) Violations of the aforegoing provisions of this rule shall be punishable as contempt and subject to injunctive relief in a proceedings to be commenced by the Committee on Unauthorized Practice. Such proceedings shall be conducted before a judge of this court designated by the Chief Judge and subject to review in the usual appellate practice upon application, by either the petitioning Committee on Unauthorized Practice or the respondent, filed with the Clerk within ten days from the entry of the judgment by the hearing judge.
 
 
 [8]
 Rule 46 II. UNAUTHORIZED PRACTICE OF LAW
 (a) Committee on Unauthorized Practice of Law.
 (1) The Court shall appoint a standing committee known as the Committee of Unauthorized Practice of Law consisting of six members of the Bar of this Court. The Chairman and Vice Chairman shall be designated by the Court. One-third of those first appointed shall serve for the term of one year, one-third for two years, and the remainder and all thereafter for the term of three years and until their successors have been appointed. In case of vacancy caused by death, resignation or otherwise, a successor appointed shall serve the unexpired term of his predecessor. When a member holds over after the expiration of the term for which he was appointed, the term he serves after the expiration of the term for which he was appointed shall be part of a new term. No member shall be appointed to serve longer than two consecutive regular three year terms.
 (2) Subject to the approval of the Court, the Committee shall adopt such rules and regulations as it deems necessary to carry out the provisions of this rule. The members of the Committee shall receive such compensation and necessary expenses as the Court may approve.
 (b) Practice of Law in the District of Columbia.
 (1) No person shall regularly engage in the practice of law in the District of Columbia or in any manner hold himself out as authorized or qualified to practice law in the District of Columbia unless he is an enrolled active member of the Bar.
 (2) No person, firm, association, bank or corporation shall, in the District of Columbia, advise or counsel any person on matters affecting legal rights, or practice or appear as an attorney at law for a person other than himself in any court, or furnish an attorney or attorneys to render legal services; or hold himself out to the public as being entitled to practice; or in any other manner assume to be an attorney at law, or assume, or use or advertise the title of lawyer, attorney or counselor, or any equivalent title, in such manner as to convey the impression that he is entitled to practice law, or in any manner advertise that he either alone or together with any other person or persons maintains an office for the practice of law in the District of Columbia, without being a member of the Bar; provided that nothing contained herein shall prevent accountants and trust companies and banks with trust departments from performing such acts as may be authorized within the statements of principles between the American Bar Association and their respective professional groups as the same are set forth in the Martindale-Hubbell Law Directory; or prevent life insurance underwriters from performing such acts as may be authorized by the statements of principles between the Bar Association of the District of Columbia and the District of Columbia Life Underwriters Association, Inc., and The American Society of Chartered Life Underwriters; or prevent realtors from performing such acts as may be authorized by the statements of principles between the Bar Association of the District of Columbia and the Washington Board of Realtors, Inc., as published in the D.C. Bar Journal, page 16, Volume 35 # 8-10 (August-September-October 1978); or prevent title insurance companies from performing such acts as may be authorized by the statements of principles between The District of Columbia Bar and the Title Insurance Companies, dated February 20, 1975.
 (3) The practice of law as used in this rule shall include, but is not limited to, appearing for a person other than himself as attorney in any court, or preparing deeds, mortgages, contracts, assignments, discharges, leases, trust instruments or any other instruments affecting real or personal property or any interest therein, or preparing wills, codicils, or any other instruments affecting the disposition of property or decedents' estates, or preparing pleadings of any kind in any action brought before any court, or preparing or expressing formal opinions or consulting with respect to any of the foregoing or on any other matters of law.
 (4) Nothing herein shall prohibit a person from appearing and participating in a particular action or proceeding in any court of the District of Columbia if special permission therefor has been granted by any such court.
 (5) Nothing herein shall prohibit any person employed by the United States or by any department, commission, or agency of the United States, whether as a lawyer or otherwise, from performing and carrying out the duties and functions of his office, except to the extent that such duties include practice before a court of the District of Columbia, in which case he shall either become an enrolled active member of the Bar or obtain special permission therefor.
 (6) Nothing herein shall prohibit any person from appearing and participating in a particular action or proceeding before any court of the United States to the extent that such appearance and participation is authorized by any rule or order of such court, provided the person is not otherwise regularly engaged in the practice of law in the District of Columbia or is not in any manner holding himself out as authorized or qualified to practice law in the District of Columbia without having become an enrolled active member of the Bar. This rule shall not be construed to repeal, supersede or modify any law or rule which relates to practice before any court of the United States.
 (7) Nothing herein shall prohibit any person from practicing before any department, commission, or agency of the United States to the extent that such practice is authorized by any rule or regulation of any such department, commission or agency, provided the person is not otherwise regularly engaged in the practice of law in the District of Columbia or is not in any manner, except as permitted by the license granted by such department, commission or agency, holding himself out as authorized or qualified to practice law in the District of Columbia without having become an enrolled active member of the Bar. This rule shall not be construed to repeal, supersede or modify any law, rule or regulation which relates to practice before any department, commission or agency of the United States.
 (8) Violations of the aforegoing provisions of this rule shall be punishable as contempt and/or subject to injunctive relief in a proceedings to be commenced by the Committee on Unauthorized Practice. Such proceedings shall be conducted before a judge of this court designated by the Chief Judge and subject to review in the usual appellate practice upon application, by either the petitioning Committee on Unauthorized Practice or the respondent, filed with the Clerk within ten days from the entry of the judgment by the hearing judge.
 
 
 [9]
 See Rule 46 II (b)(1) to (5), the text of which is reprinted in n. 7, supra
 
 
 [10]
 See n. 8, supra
 
 
 [11]
 Tr. R5A, App. A. A later letter, see n. 14, infra, also requested information about plaintiff Barbara Simmons, who is married to plaintiff Morton L. Simons; together they practice law under the partnership name of Simons & Simons. The Committee's response related to the practice of both plaintiffs, as did Mr. Simons' letters. The plaintiffs state identical causes of action and on appeal the disposition of their respective claims is similarly identical
 
 
 [12]
 Tr. R5A, App. B. (emphasis added)
 
 
 [13]
 Id
 
 
 [14]
 Tr. R5A, App. C (emphasis added)
 
 
 [15]
 The prayer for relief also sought preliminary and permanent injunctions, compensatory damages of $150,000, punitive damages of $150,000, reasonable attorney's fees and "such other and further relief as may appear to be proper . . .". My discussion of judicial immunity necessarily is limited to the plaintiffs' damage claims since judicial immunity does not extend to prayers for declaratory or injunctive relief, Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); U. S. v. McLeod, 385 F.2d 734, 738, n.3 (5th Cir. 1967); Fowler v. Alexander, 478 F.2d 694, 696 (4th Cir. 1973), which in any event were dismissed as moot in the district court, a ruling which was summarily affirmed by a motions panel of this court in an order issued March 3, 1978
 
 
 [16]
 This fact would be immaterial if plaintiffs were engaging in the practice of law in a manner prohibited by the rules approved by the District of Columbia Court of Appeals since the practice of law extends beyond the visible acts of court appearances to encompass acts performed including, but not limited to,
 preparing deeds, mortgages, contracts, assignments, discharges, leases, trust instruments or any other instruments affecting real or personal property or any interest therein, or preparing wills, codicils, or any other instruments affecting the disposition of property or decedents' estates, or preparing pleadings of any kind in any action brought before any court, or preparing or expressing formal opinions or consulting with respect to any of the foregoing or on any other matters of law. Rule 46 II (b)(3) (emphasis added).
 See J. H. Marshall & Associates, Inc. v. Burleson, 313 A.2d 587, 600 (D.C.App.1973); State v. Schumacher, 214 Kan. 1, 519 P.2d 1116, 1121-2 (1974). A letterhead listing a District of Columbia address, without any express limitation on the nature of practice, permits a reasonable inference that the Simonses are engaged in the general practice of law in the District, and provided a basis for the Committee's inquiry. See, e. g. The Florida Bar v. Moran, 273 So.2d 390 (Fla.1973).
 
 
 [17]
 Rule 46 II (b)(8)
 
 
 [18]
 The case was remanded for further proceedings and is still pending
 
 
 [36]
 In Pierson v. Ray, 386 U.S. 547 (87 S.Ct. 1213, 18 L.Ed.2d 288) (1967), we recognized that state judges sued on constitutional claims pursuant to § 1983 could claim a similar absolute immunity. The Court reasoned:
 "It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation." Id., at 554 (87 S.Ct. at 1218).
 
 
 [37]
 The Imbler Court specifically reserved the question "whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." 424 U.S., at 430-431 (96 S.Ct., at 995)
 
 
 [19]
 The Chairman of the Committee on Unauthorized Practice or his designee was authorized on 11 October 1972 by order of the Court of Appeals en banc to request the issuance of subpoenas in connection with the duties of the Committee. App. A. to Docket Entry 11
 
 
 [40]
 Nor do we think that administrative enforcement proceedings may be distinguished from criminal prosecutions on the grounds that the former often turn on documentary proof. The key point is that administrative personnel, like prosecutors, "often must decide, especially in cases of wide public interest, whether to proceed to trial where there is a sharp conflict in the evidence." Imbler, 424 U.S., at 426 n. 24 (96 S.Ct., at 993). The complexity and quantity of documentary proof that may be adduced in a full scale enforcement proceeding may make this decision even more difficult than the decision to prosecute a suspect
 
 
 [20]
 See, infra, p. --- of 207 U.S.App.D.C., p. 812 of 643 F.2d
 
 
 [21]
 Cf. Martinez v. State, 85 Cal.App.3d 430, 149 Cal.Rptr. 519 (1978), jur. noted, Martinez v. California, 441 U.S. 960, 99 S.Ct. 2403, 60 L.Ed.2d 1064 (1979) (Absolute immunity protects state from damage actions for paroling prisoner who commits murder after release). This case was argued in the United States Supreme Court on November 5, 1979; no decision had been handed down at the time this opinion was released
 
 
 [1]
 D.C.Code § 11-2501(a) (1973)
 
 
 [2]
 D.C.Ct.App.R. 46 II (a)(1)-(2)
 
 
 [3]
 D.C.Ct.App.R. 46 II (a)(2)
 
 
 [4]
 The exceptions provide:
 (6) Nothing herein shall prohibit any person from appearing and participating in a particular action or proceeding before any court of the United States to the extent that such appearance and participation is authorized by any rule or order of such court, provided the person is not otherwise regularly engaged in the practice of law in the District of Columbia or is not in any manner holding himself out as authorized or qualified to practice law in the District of Columbia without having become an enrolled active member of the Bar. This rule shall not be construed to repeal, supersede or modify any law or rule which relates to practice before any court of the United States.
 (7) Nothing herein shall prohibit any person from practicing before any department, commission, or agency of the United States to the extent that such practice is authorized by any rule or regulation of any such department, commission or agency, provided the person is not otherwise regularly engaged in the practice of law in the District of Columbia or is not in any manner, except as permitted by the license granted by such department, commission or agency, holding himself out as authorized or qualified to practice law in the District of Columbia without having become an enrolled active member of the Bar. This rule shall not be construed to repeal, supersede or modify any law, rule or regulation which relates to practice before any department, commission or agency of the United States.
 
 
 [5]
 D.C.Ct.App.R. 46 II (b)(8)
 
 
 [6]
 Committee Rule A, para. 2, reprinted in Brief for Appellees at 12
 
 
 [7]
 Committee Rule B, reprinted in Brief for Appellees at 13
 
 
 [8]
 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963) (state may not prohibit nonlawyer patent agent registered with Patent Office from preparing and prosecuting patent applications within the state)
 
 
 [9]
 The panel was composed of Chief Judge Bazelon and Judges Wright and Robinson
 
 
 [10]
 Simons v. Bellinger, 177 U.S.App.D.C. 270, 543 F.2d 417 (1976) (decided without opinion under Local Rule 13(c))
 
 
 [11]
 Letter from Edgar T. Bellinger to Morton L. Simons (9 May 1977)
 
 
 [12]
 Simons v. Bellinger, No. 75-1164, slip op. at 3 (D.D.C. 6 Sept. 1977)
 
 
 [13]
 The motions panel consisted of Judges McGowan, Leventhal, and Tamm. Judge Leventhal did not participate in the order
 
 
 [14]
 Spalding v. Vilas, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896); Briggs v. Goodwin, 186 U.S.App.D.C. 179, 184-85, 569 F.2d 10, 15-16 (1977), cert. denied, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978); Cooper v. O'Connor, 69 U.S.App.D.C. 100, 194, 99 F.2d 135, 139, cert. denied, 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 414 (1935)
 
 
 [15]
 Barr v. Mateo, 360 U.S. 564, 575, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). Although Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), significantly narrowed the degree of immunity apparently granted executive officials by Barr, it did not purport to affect the scope-of-authority holding of Barr
 
 
 [16]
 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963); see note 8 supra
 
 
 [17]
 Pertinent excerpt at note 4 supra
 
 
 [18]
 186 U.S.App.D.C. 179, 184, 569 F.2d 10, 15 (1977), cert. denied, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978)
 
 
 [19]
 Simons v. Bellinger, No. 75-1164, slip op. at 3 (D.D.C. 6 Sept. 1977) (emphasis added)
 
 
 [20]
 Brief for Appellants at 17
 
 
 [21]
 Reply Brief for Appellants at 4
 
 
 [22]
 Id. at 5
 
 
 [23]
 Id
 
 
 [24]
 Id
 
 
 [25]
 Briggs v. Goodwin, 186 U.S.App.D.C. at 190, 569 F.2d at 21
 
 
 [26]
 Moreover, even if licensing is not a judicial function, appellees may still be protected by immunity. Just as members of the executive branch performing adjudicatory functions may be protected by the same absolute immunity provided judges, Butz v. Economou, 438 U.S. 478, 511-12, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), so also those ostensibly acting under judicial supervision may be protected by the same qualified immunity provided members of the executive branch when constitutional deprivations are alleged
 
 
 [27]
 Kissel v. Breskow, 579 F.2d 425, 428-30 (7th Cir. 1978); Slavin v. Curry, 574 F.2d 1256, 1266 (5th Cir.), modified on other grounds, 583 F.2d 779 (5th Cir. 1978); Mayes v. Honn, 542 F.2d 822, 824 (10th Cir. 1976) (dicta); Ginger v. Circuit Court, 372 F.2d 621, 625 (6th Cir.), cert. denied, 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 998 (1967); Clark v. Washington, 366 F.2d 678, 681 (9th Cir. 1966); Moity v. Louisiana State Bar Ass'n, 414 F.Supp. 180, 183 n.17 (E.D.La.), aff'd, 537 F.2d 1141 (5th Cir. 1976); Peterson v. Knutson, 367 F.Supp. 515 (D.Minn.1973), aff'd, 505 F.2d 736 (8th Cir. 1974); cf. Hoke v. Board of Medical Examiners, 445 F.Supp. 1313 (W.D.N.C.1978) (members of Board of Medical Examiners protected by absolute immunity for decision to prefer charges)
 
 
 [28]
 See, e.g., Ex Parte Secombe, 60 U.S. (19 How.) 9, 13, 15 L.Ed. 565 (1857); Clark v. Washington, 366 F.2d 678, 681 (9th Cir. 1966); Laughlin v. Clephane, 77 F.Supp. 103, 105-06 (D.D.C.1947); J. H. Marshall & Assocs. v. Burleson, 313 A.2d 587, 591 (D.C.App.1973)
 
 
 [29]
 See Briggs v. Goodwin, 186 U.S.App.D.C. at 218-25, 569 F.2d at 49-56 (Wilkey, J., dissenting)
 
 
 [30]
 D.C.Code § 11-2501(a) (1973)
 
 
 [31]
 Wood v. Strickland, 420 U.S. 308, 319, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975) (quoting Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)) (relating to immunity of school board officials for § 1983 violations)
 
 
 [32]
 186 U.S.App.D.C. 179, 569 F.2d 10 (1977), cert. denied, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978)
 
 
 [33]
 Relying on our decision in Expeditions Unlimited v. Smithsonian, 184 U.S.App.D.C. 397, 566 F.2d 289 (1977), cert. denied, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978), appellees argue that the "injury to business interests" they characterize as having been allegedly suffered by the Simonses does not "implicate the kind of basic constitutional rights which . . . limit" the traditional absolute immunity granted federal officers. Brief of Appellees at 26. In essence, appellees are asking the court to do one of two things: (1) to hold that appellants have made no claim compensable under the federal Constitution and find that any remaining nonconstitutional tort claim is precluded by absolute immunity; or (2) to hold that even if appellants state a compensable claim under the Constitution, the infringed right is not of sufficient magnitude to justify qualifying the appellees' immunity
 I would decline the invitation. As to the first possibility, the district court has not made a finding regarding the validity of the constitutional claims, and, at this point, neither should we. As to the second, I do not believe it wise to base the degree of the Committee's immunity on the magnitude of the constitutional right infringed. In Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), respondents alleged facts giving rise to what might be termed "injury to business interests." See id. at 482-83, 98 S.Ct. 2894. In its holding generally limiting the immunity granted federal executive officials against constitutional claims, the Court made no reference to the magnitude of the right infringed:
 We therefore hold that, in a suit for damages arising from unconstitutional action, federal executive officials exercising discretion are entitled only to the qualified immunity specified in Scheurer, subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of public business.
 Id. at 507, 98 S.Ct. at 2911.
 
 
 [34]
 Cases cited note 27 supra
 
 
 [35]
 Appellees also make a passing comparison of the Committee to a grand jury. They argue that both act "in 'essentially the same' manner . . . in 'searching out violations' of law with a view to exercising enforcement powers," and should be protected by the same absolute quasi-judicial immunity. However, the Committee possesses no more enforcement power than does a prosecutor the power to commence and direct proceedings seeking sanctions against purported violators. Neither the Committee nor the prosecutor possesses independent power to impose sanctions, nor issue the equivalent of an indictment. For that reason, I believe that at most the Committee members are entitled to the immunity granted prosecutors, and that unquestionably depends on the function being performed by the prosecutor. Imbler v. Pachtman, 424 U.S. 409, 431 n.33, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); Briggs v. Goodwin, 186 U.S.App.D.C. at 188-90, 569 F.2d at 19-21
 
 
 [36]
 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)
 
 
 [37]
 Id. at 515-16, 98 S.Ct. at 2915-16. See Kissel v. Breskow, 579 F.2d 425 (7th Cir. 1978) (Executive Secretary of the Disciplinary Commission protected by absolute immunity "in determining to file a grievance, in filing the grievance, in notifying (the appellant), and in seeking a Commission determination on what disciplinary actions should be taken")
 
 
 [38]
 423 F.2d 188 (2d Cir. 1969), aff'g 290 F.Supp. 835 (S.D.N.Y.1968), cert. denied, 398 U.S. 929, 90 S.Ct. 1819, 26 L.Ed.2d 92 (1970)
 
 
 [39]
 The majority "would prefer not to follow" Dacey for three reasons: (1) the holding is tantamount to a grant of qualified immunity; (2) the court's conclusion that although the association acted as a prosecutor, it was not entitled to immunity when initiating a lawsuit is "plainly inconsistent" with Imbler v. Pachtman, 424 U.S. 409, 431, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976) ("in initiating a prosecution . . . the prosecutor is immune from a civil suit for damages"); (3) in Dacey the association was trying to suppress a book, not discipline a person giving specific legal advice to specific individuals. Majority opinion, 207 U.S.App.D.C. at ----, 643 F.2d at 778. I agree that Dacey is difficult to harmonize with Butz and Imbler ; however, I would not find it necessary to pass on the wisdom of applying Dacey here because of my conclusion that, in view of the investigative nature of the challenged activities, the Committee members are entitled to, at most, qualified immunity
 
 
 [40]
 186 U.S.App.D.C. at 190, 569 F.2d at 21
 
 
 [41]
 Id
 
 
 [42]
 See Imbler v. Pachtman, 424 U.S. 409, 431 n.33, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); Briggs v. Goodwin, 186 U.S.App.D.C. at 188-90, 569 F.2d at 19-21
 
 
 [43]
 Briggs v. Goodwin, 186 U.S.App.D.C. at 188-89, 569 F.2d at 19-20
 
 
 [44]
 Of course I do not mean to imply that the timing and location of challenged conduct are of themselves entirely dispositive of the immunity issue. Briggs and Imbler indicate that they are not. Imbler v. Pachtman, 424 U.S. 409, 431 n.33, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); Briggs v. Goodwin, 186 U.S.App.D.C. at 192, 569 F.2d at 23. Nevertheless, I believe these factors are relevant in determining whether questioned activity may be labeled investigative or advocatory. See Daniels v. Kieser, 586 F.2d 64, 67 n.5 (7th Cir. 1978) (although the timing of alleged prosecutorial misconduct not wholly dispositive, "in making the most difficult decision as to what behavior is investigative or administrative and what is quasi-judicial, whether or not the trial has commenced may be relevant"), cert. denied, 441 U.S. 931, 99 S.Ct. 2050, 60 L.Ed.2d 659 (1979)
 
 
 [45]
 Majority opinion, 207 U.S.App.D.C. at ----, 643 F.2d at 784; see id. at ---, 643 F.2d at 780
 
 
 [46]
 Briggs v. Goodwin, 186 U.S.App.D.C. at 188-89, 569 F.2d at 19-20 (emphasis added)
 
 
 [47]
 In establishing its investigative-advocatory dichotomy, Briggs points out that in Robichaud v. Ronan, 351 F.2d 533 (9th Cir. 1965), "the crucial events took place only after the prosecutor's field of vision had already narrowed to one crime and one prospective defendant." Briggs v. Goodwin, 186 U.S.App.D.C. at 192, 569 F.2d at 23 (emphasis added). After the plaintiff was arrested, the police allegedly under direction of the county attorney attempted to extract a confession from her through various illicit means. It was the attempt so to intimidate her that prompted the Ninth Circuit to label the prosecutor's conduct investigative, and decline to immunize the activity. By its approving reference to Robichaud, Briggs seems to acknowledge that even where investigation has focused on a particular individual and crime, absolute immunity is not always appropriate
 The attempt by the majority to distinguish Robichaud is unconvincing. The purportedly distinguishing factor is that there, "the prosecutor allegedly knew that he lacked a foundation for his assertion that Miss Robichaud was the perpetrator, (and thus) his inquiry into her affairs involved investigative police work." Majority opinion, 207 U.S.App.D.C. at ---- n.14, 643 F.2d at 784 n.14. But regardless of the prosecutor's state of mind, the fact remains that an inquiry focused on a particular individual and wrong was classified as investigatory, not advocatory. And to the extent my colleagues imply that the immunity question turns on the officer's subjective state of mind and the reasonability of his basis for investigation, they backhandedly lend support to my determination that qualified immunity is the appropriate standard here.
 
 
 [48]
 My colleagues cite three post-Briggs cases from other circuits as consistent with the specific individual-specific wrong test. I do not think them applicable to the case at hand. In Safeguard Mut. Ins. Co. v. Miller, 456 F.Supp. 682, 692 (E.D.Pa.1978), officials authorized to represent the state insurance department were held entitled to absolute immunity for their activity during pretrial discovery procedures. The case is not supportive of the majority's test, because there not only had the "investigation" focused on particular defendants and wrongs, but an action already had been filed. Discovery procedures should certainly be regarded as intimately connected with the conduct of a trial. Of course, in the instant case no charges had been filed. Similarly, in Daniels v. Kieser, 586 F.2d 64 (7th Cir. 1978), cert. denied, 441 U.S. 931, 99 S.Ct. 2050, 60 L.Ed.2d 659 (1979), the court granted absolute immunity to a prosecutor who had allegedly given false testimony to obtain an arrest warrant for the plaintiff. In that case the plaintiff was a necessary witness in the prosecution's case, and the court held that ensuring the presence of that party was intimately connected with the conduct of that trial. In Front Runner Messenger Serv., Inc. v. Ghini, 468 F.Supp. 305, 309 (N.D.Ill.1979), the district court held that a city attorney who allegedly gave false testimony to obtain an arrest warrant was performing "conduct within the prosecutorial function of his office." Arguably this immunity determination was an alternative basis for dismissal, and to that extent the language may be regarded as dictum. If it is not dictum I believe that the decision was wrong in granting absolute immunity to a prosecutor for falsely swearing out a warrant; in the absence of an intimate connection with the initiation and conduct of a prosecution, it would seem he was acting more as a policeman than as an advocate. See Guerro v. Mulhearn, 498 F.2d 1249, 1256 (1st Cir. 1974). But see Atkins v. Lanning, 556 F.2d 485, 488 (10th Cir. 1977)
 Other recent cases indicate that prosecutorial conduct with respect to particular persons and wrongs is not always considered advocatory and thereby protected by absolute immunity. Clark v. Lutcher, 436 F.Supp. 1266, 1272-73 (M.D.Pa.1977) (causing arrest and incarceration of plaintiff in connection with death of another allegedly without probable cause was investigative conduct); see Slavin v. Curry, 574 F.2d 1256, 1264-65 (5th Cir. 1978) (alleged alteration of trial transcript after trial and prior to appeal not part of prosecutorial function); Guerro v. Mulhearn, 498 F.2d 1249, 1256 (1st Cir. 1974) (district attorney's cooperation in obtaining search warrant based on allegedly perjured testimony classified as investigatory); Robichaud v. Ronan, 351 F.2d 533 (9th Cir. 1965) (see note 47 supra ); Maney v. Ratcliff, 399 F.Supp. 760, 770 (E.D.Wisc.1975) (leaving entry on National Crime Information Center system after deciding not to extradite plaintiff outside the scope of prosecutorial immunity). See also J. D. Pflaumer, Inc. v. Department of Justice, 450 F.Supp. 1125, 1133 (E.D.Pa.1978) (without reference to the particularity vel non of the grand jury proceeding, the court stated, "the gathering of evidence for the purpose of supporting the presentation of an indictment to the grand jury, at least in the context of this case, is more a kin (sic ) to the prosecutor's role as an investigator and therefore outside the quasi-judicial phase of his duties").
 
 
 [49]
 The Chairman began his letter to Simons by writing:
 The District of Columbia Bar has supplied us with a list of persons who through some type of listing such as the telephone directory, appear to be holding themselves out as attorneys in the District of Columbia. Pursuant to the Rules of this Court, any person practicing law or holding himself or herself out as authorized to practice law in the District of Columbia must be a duly enrolled active member of The District of Columbia Bar. Since your name appears on the list furnished us, we would appreciate your prompt written advice as to whether or not you are a registered member of The District of Columbia Bar.
 
 
 [50]
 E.g., Majority opinion, 207 U.S.App.D.C. at ----, ----, 643 F.2d at 780, 785
 
 
 [51]
 See notes 4, 8 and accompanying test supra
 
 
 [52]
 I think my colleagues' reliance on the Committee's purported "prima facie" case against appellants may represent a covert application of the qualified immunity standard, and thus indirectly supports my conclusion that the Committee is protected by qualified immunity here. Their reliance on the "prima facie" case seems very similar to the Second Circuit's holding in Dacey that because the association had probable cause to initiate unauthorized practice proceedings against Mr. Dacey, his lawsuit was correctly dismissed. As both our opinions observe, the Dacey result was tantamount to a holding that such entities are shielded by only qualified immunity when first amendment rights are involved. See note 39 and accompanying text supra ; majority opinion, 207 U.S.App.D.C. at ----, 643 F.2d at 778
 
 
 [53]
 Brief for Appellees at 20-21
 
 
 [54]
 Id. at 21
 
 
 [55]
 The majority opinion also submits that the Committee is subject "to numerous checks capable of deterring, or correcting, unconstitutional conduct." Majority opinion, 207 U.S.App.D.C. at ----, 643 F.2d at 782. It points out that the contempt proceedings are held before an impartial judge of the Court of Appeals of the District of Columbia, they are adversarial in nature, and subject to appellate review by the entire court of appeals. It suggests the Committee's power is also limited because violation of the unauthorized practice rule is punishable only by contempt and/or subject to injunctive relief. However, these safeguards only protect against unconstitutional action in the initiation and conduct of lawsuits; they do not protect against excesses in the investigative or administrative efforts of the Committee. The majority also submits that the three-year limitation on the terms of Committee members and the availability of writs of mandamus protect against unlawful conduct. Assuming that the possibility of mandamus relief and the short length of terms for Committee members to some extent protect against unconstitutional abuse of power, I am not convinced that they constitute meaningful restraints on investigative misconduct here
 
 
 [56]
 Brief for Appellees at 20
 
 
 [57]
 Imbler v. Pachtman, 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976)
 
 
 [58]
 Apparently only the Committee as an entity is authorized to commence judicial proceedings regarding the unauthorized practice of law. See D.C.Ct.App.R. 46 II(b)(8)
 
 
 [59]
 Affidavit of Edgar T. Bellinger at 3 (7 Oct. 1975). Another alleged purpose of the investigation was to determine, "if any violation were felt to exist or have been committed, whether voluntary compliance could be secured or whether a petition to the Court for issuance of a rule to show cause should be filed." Id. At the time this suit was filed, the Committee was just beginning the investigative portion of its proceedings, and had not yet come to the point of deciding whether or not to initiate proceedings. Cf. Briggs v. Goodwin, 186 U.S.App.D.C. at 193, 569 F.2d at 24 (qualified immunity where prosecutor's task was to "determine whether any violations of federal law properly attributable" to anti-war group or its members had occurred, "ascertain the precise nature of those crimes, and the identity of" the perpetrators)
 
 
 [60]
 Majority opinion, 207 U.S.App.D.C. at ---- n.10, 643 F.2d at 781 n.10
 
 
 [61]
 Id. at --- - ---, 643 F.2d at 782-783
 
 
 [62]
 See note 35 supra
 
 
 [63]
 Butz v. Economou, 438 U.S. at 508, 98 S.Ct. 2894, 57 L.Ed.2d 895
 
 
 [64]
 Wood v. Strickland, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975); see O'Connor v. Donaldson, 422 U.S. 563, 577, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). Indeed, plaintiffs have alleged that two members of the Committee represent clients who are in competition with clients of the plaintiffs, and that this adversary relationship influenced the zeal with which the Committee pursued the plaintiffs